NORTHWESTERN PACIFIC RAIL-
ROAD COMPANY, Plaintiff,

v.

UNITED STATES of America and
Interstate Commerce Commis-
sion, Defendants,

and

City of San Rafael, et al., Public Utilities
Commission, et al., anid Atchison, Tope-
ka and Santa Fe Railway Company, In-
tervening Defendants.

Civ. No. 41639.

United States District Court
N. D. California, S. D.

April 17, 1964.

Randolph Karr, Frederick E. Fuhrman, Harold S. Lentz, San Francisco, Cal., for plaintiff Northwestern Pacific R. Co.

William H. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Cecil F., Poole, U. S. Atty., San Francisco, Cal., for the United States.

Robert W. Ginnane, Gen. Counsel, H. Neil Garson, Associate Gen. Counsel, Robert S. Burk, Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Graham, James & Rolph, Boris H. Lakusta, E. Myron Bull, Jr., San Francisco, Cal. for intervening defendants Cities of San Rafael, San Anselmo, Fairfax and Sausalito, California; County of Marin; Marin Industrial Development Foundation; Camgros Gravel and Fuel Co., Inc.; Chris Craft Sales of San Rafael; Colonial Wax Products Corporation of California; Golden Gate Distributing Company; Henry Hess Company; California Newspapers, Inc. (San Rafael Independent Journal); McPhail Fuel Co.; PBM Inc.; Rice Supply, Inc.; A. G. Schoonmaker Co.; Service Lumber Co.; and Shamrock Materials, Inc.

Richard E. Tuttle, Hector Anninos, San Francisco, Cal., for intervening defendants The People of the State of California and The Public Utilities Commission of California.

Frederick G. Pfrommer, San Francisco, Cal., for intervening defendant Atchison, Topeka and Santa Fe R. Co.

Before BROWNING, Circuit Judge, and SWEIGERT and ZIRPOLI, District Judges.

PER CURIAM.

This action involves the petition of Northwestern Pacific Railroad to set aside an order of the Interstate Commerce Commission which denied Northwestern's request to abandon 2.465 miles of railroad line in Marin County, California. There are two major issues for consideration. First, plaintiff Northwestern Pacific contends that this Court should exercise its own independent judgment on the law and the facts pursuant to the "constitutional fact" doctrine as announced in Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S. Ct. 527, 64 L.Ed. 908 (1920). Second, plaintiff contends that even if the Court refuses to make an independent judgment, the record does not contain substantial evidence to support the findings of the Commission as required by 5 U.S. C. § 1009(e). The Court has concluded that the "constitutional fact" doctrine does not apply to this case, and that, viewing the record as a whole, the findings of the Commission are supported by substantial evidence.

Plaintiff's railroad system extends from a point near the Oregon border along the coastal area of northern California to San Francisco Bay. From the north, the line runs south to Ignacio, a town in northern Marin County, approximately twenty-five miles north of San Francisco. At Ignacio the line splits, so that cars may be routed from Ignacio to Schellville, a town on the northern edge of San Francisco Bay, where plaintiff has a hookup with the Southern Pacific system. The other branch of the line runs

south from Ignacio, through the Puerto Suello Tunnel to Tiburon, a point directly across the Bay and north of the City of San Francisco. At Tiburon the Atchison, Topeka and Santa Fe Railway ferries the cars by barge to either Richmond in the East Bay area or to San Francisco. It should be noted that the portion of Marin County south of the tunnel, which is the area that is the subject matter of this lawsuit, is primarily a residential suburb of San Francisco, consisting of many small towns and villages. On July 20, 1961 two juveniles set fire to the Puerto Suello Tunnel, and as far as can be determined, the entire tunnel was destroyed by cave-ins. The tunnel was the only rail route to southern Marin County, except for the Santa Fe barge system. Since the fire, rail service to and from this area has been exclusively by means of the Santa Fe Ferry and has been reduced from daily to twice a week service.

On August 21, 1961 Northwestern Pacific filed an application with the Interstate Commerce Commission for the grant of a certificate of public convenience and necessity under § 1(18) of the Interstate Commerce Act, 49 U.S.C. § 1(18), authorizing abandonment of two and one half miles of track in Marin County north of San Rafael. This section of track is primarily the Puerto Suello Tunnel. It should be noted that petitioner is not asking that it be permitted to abandon the entire operation in Marin County, but only the means of access to southern Marin from the northern portion of its line. Protests to the application were filed by several cities, industries, and development groups in the area affected, seven railway labor organizations, the Atchison, Topeka and Santa Fe Railway, and the State and Public Utilities Commission of California. On September 17, 1962 the hearing examiner filed his report and concluded in part as follows:

"Upon consummation of the proposed abandonment, rail transportation service between NWP points south of the tunnel, on the one hand, and, on the other, *interstate* and intrastate points on the lines of other railroads would be confined to routes via Tiburon. Rail service between NWP points north of the tunnel and points on the lines of other railroads would be confined to the one route via Schellville. Local service between NWP points would be divided into two segments, one north of the tunnel and the other south thereof. With restoration of the tunnel, there will continue to be available as to all NWP points the through routes via both Schellville and Tiburon and the breaking of applicant's main line at the tunnel will be avoided. NWP apparently is able, financially and otherwise, to restore the tunnel, and upon basis of its own revenue and expense figures will realize net revenues from continued operation through the tunnel that will justify reconstruction of the tunnel and the resumption of service through it. Clearly, no burden upon *interstate* commerce will result from reopening of the tunnel when the matter is considered from the standpoint of NWP as an individual corporate entity. The through route maintained by NWP and Santa Fe via Tiburon reflects a material and valuable contribution to the *interstate* and intrastate transportation system in the area. It is demonstrated that such system is capable of affording daily service by railroad at NWP main line points when both of the major roads connecting with NWP have opportunity to compete for the involved traffic. The collapse of the tunnel already has forced service curtailments at points south of the tunnel with a resumption of daily service apparently dependent upon whether the traffic flow which formerly obtained via Tiburon can be reactivated. Failure in this respect, aside from inability to restore daily service, also renders possible further deterioration in service. As argued by certain protestants, accomplishment of the proposal would leave

south of the tunnel site an uneconomic 'island' system with limited, roundabout and unsatisfactory access by water only, which most assuredly would be expected to deteriorate further, both physically and in financial results until it becomes itself a burden upon *interstate* commerce and a legitimate candidate for abandonment. The beneficiary of the abandonment apparently would be applicant's stockholder and connecting carrier, Southern Pacific Company, who would realize as its principal benefit the liquidation or diminution of carrier competition. It further appears that the increase in gross revenues likely to accrue to Southern Pacific Company as a result of the proposed abandonment would not exceed the sum of the anticipated decrease in revenues by NWP and the estimated loss in revenues by Santa Fe, the effects being that the carriers serving the area would not as a group realize any net gain and the shipping public would be left with fewer facilities for rail transportation and materially less efficient and less frequent service." (Italics supplied)

Following the examiner's report, the plaintiff petitioned the Commission for a review of the examiner's findings. On May 22, 1963 the Commission (Division 3) entered its report sustaining the examiner's findings and order. Plaintiff's petition for a finding that an issue of general transportation importance was involved requiring consideration by the entire Commission was denied by order of July 5, 1963. 320 I.C.C. 19.

Plaintiff filed its complaint to set aside the order of the Commission in this Court on July 19, 1963. The motions of the State of California, the Public Utilities Commission of California, the Santa Fe Railway, and several civic and industrial groups in Marin County to intervene as defendants were granted. On October 25, 1963 the Chief Judge of the Ninth Circuit ordered that a three judge district court be convened to hear plaintiff's petition, pursuant to the provisions of § 2284, Title 28 United States Code.

Plaintiff's first contention that this Court must make an independent judgment on the facts is predicated on its contention that the Commission's order unduly burdens interstate commerce and is unconstitutionally confiscatory. Three cases have imposed a constitutional requirement for an exercise of independent judgment on the law and facts where it is claimed that administrative action is in violation of constitutional rights. Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908 (1920); Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922). Although there is some doubt as to whether the constitutional fact doctrine has any validity today, see Davis, Administrative Law Treatise, § 29.09, the Court concludes that even if it does have validity, the present record does not merit its utilization.

In rate review cases, it is clear that agency action is not unconstitutional unless it results in a confiscation of property without just compensation. A rate is confiscatory only if it results in an over-all loss of net profits to the petitioning railroad; that is, the Commission may adopt a rate schedule which renders the particular service unprofitable to the railroad, but as long as there is not a net loss to the entire system, there is no confiscation. In regard to confiscation, the Supreme Court held in B. & O. R. Co. v. United States, 345 U.S. 146, at 148, 73 S.Ct. 592 at 593, 97 L.Ed. 912 that:

"So long as a railroad is not caused by such regulations to lose money on its over-all business, it is hard to think that it could successfully charge that its property was being taken for a public use 'without just compensation.' And apparently the railroads rely not on the just compensation but on the Due Process provision of the Fifth Amendment."

Although we have not found a single case in which the Supreme Court has held that the confiscation standard of constitutional agency action applies to abandonment as well as rate cases, the Court in the recent case of Southern R. Co. v. North Carolina (United States v. North Carolina), 84 S.Ct. 564, 571, had occasion to review the standards to be applied by the Commission in abandonment cases. The Court said:

"This Court has long recognized that the Commission may properly give varying weights to the overall prosperity of the carrier in differing situations. Thus, in Colorado v. United States, 271 U.S. 153 [46 S. Ct. 452, 70 L.Ed. 878], which also involved a situation in which the Commission was required to balance public convenience and necessity against undue burdens on interstate commerce, it was specifically noted that 'In many cases, it is clear that the extent of the whole traffic, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant conditions, are such that the carrier may not justly be required to continue to bear the financial loss necessarily entailed by operation. In some cases * * * the question is whether abandonment may justly be permitted, in view of the fact that it would subject the communities directly affected to serious injury while continued operation would impose a relatively light burden upon a prosperous carrier.' 271 U.S., at 168–169 [46 S.Ct. at 456, 70 L.Ed. 878]. *In cases falling within the latter category, such as those involving vital commuter services in large metropolitan areas where the demands of public convenience and necessity are large, it is of course obvious that the Commission would err if it did not give great weight to the ability of the carrier to absorb even large deficits resulting from such services.* But where, as here,

the Commission's findings make clear that the demands of public convenience and necessity are slight and that the situation is, therefore, one falling within the first category delineated in Colorado, it is equally proper for the Commission, in determining the existence of the burden on interstate commerce, to give little weight to the factor of the carrier's overall prosperity." (Italics supplied)

■ From the above language we have no reason to think that the Supreme Court would not adopt the same standard of confiscation for abandonment cases that it has adopted for rate cases. Consequently, we hold that no confiscation results from an order of the Interstate Commerce Commission denying the abandonment of rail services which are shown to be unprofitable, as long as there is no net loss to the over-all system.

Turning to the evidence on this point, we find that there is no evidence that the order requiring reconstruction of the tunnel would result in a net loss to Northwestern Pacific. The plaintiff indicates that it is a wholly owned subsidiary of the Southern Pacific Company. We find that it is unnecessary to consider whether plaintiff should be treated as part of the Southern Pacific Company or as an independent entity for the purpose of determining whether a net loss amounting to a confiscation resulted from the order in question because there is no confiscation under either theory. The evidence clearly establishes that no net loss would result if we consider the effect of the reconstruction of the tunnel on the entire Southern Pacific system. The evidence further supports the findings of the examiner that plaintiff, if considered as a separate entity, on the basis of its own revenue and expense figures, will realize net revenues from continued operation through the tunnel. Since the question is actually one of degree of profits as opposed to over-all net loss, the only remaining issue is whether there is substantial evidence in the record to support the findings of the examiner.

In arguing that the findings of the Commission are not supported by substantial evidence, plaintiff accuses the Commission of a "gross misunderstanding of what the case is about." This accusation is predicated upon that portion of the decision of Division 3 (320 I.C.C. 19, page 22), which reads as follows:

"The original route via the tunnel is 17 miles from Ignacio to Tiburon and approximately 6 miles via ferry to Richmond or a total of 23 miles. The proposed alternate route, over which traffic north of the tunnel is presently moving, via Ignacio, Schellville, and Fairfield to Richmond, is 79 miles and thus approximately 240 percent more circuitous than the route via the tunnel and ferry. This alternate route has always been available to shippers on applicant's line. *However, out of 15,095 carload shipments handled by applicant in 1959 between main line points south of the tunnel (including San Francisco) on the one hand, and main line and branch points north of the tunnel on the other, some 10,024 carloads were interchanged at Tiburon.* In 1960, 7,948 out of 12,124 cars used the Tiburon gateway and for the first 5 months of 1961, 3,324 out of 5,117 cars used that point of interchange. Obviously, the cars routed via the Tiburon gateway would not have moved over that route unless it was the most efficient route for those particular cars. The substantial number of cars that utilized the Tiburon gateway in the 2 years and 5 months prior to the fire and the circuity of the *alternate route to the San Francisco area* convinces us that the traffic involved cannot be handled as efficiently via the alternate route as by way of the Tiburon gateway." (Emphasis supplied by plaintiff)

Plaintiff contends that the above quoted language of the Commission clearly shows that it misconceived the nature of the traffic involved and did not appreciate that most of the 10,024 cars interchanged at Tiburon moved to or from destinations *outside* the area described by the Commission. We do not so interpret the language of the Commission and are satisfied that it understood the nature of the traffic involved. The Commission understood that 10,024 cars were *interchanged* at Tiburon, and that these cars did not necessarily involve movements only to or within the San Francisco area. We find no confusion in the statement of the Commission which would justify a remand.

The Commission itself at one point speaks of traffic between points on the northern segment and the San Francisco terminal area and *beyond,* thereby indicating it has no limited understanding of the nature of the traffic involved. Furthermore, it adopted as its own the examiner's findings of fact and ultimate conclusions, which findings set forth the *interstate* character of the traffic involved and also specifically state "With the handling by Southern Pacific via Schellville of all traffic moving from and to NWP points north of the tunnel, the shippers would be able to route traffic in the line-haul service of Santa Fe beyond Stockton, Fresno or Bakersfield, Calif." These three cities are clearly beyond the San Francisco Bay area.

Bearing in mind the tests enunciated in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we have concluded from a full review of the entire record that the Commission's order must stand. The record is lengthy, and it would serve no useful purpose to outline the testimony of numerous witnesses and the data contained in several exhibits or to point out the various conflicts therein. We merely state that there is substantial evidence to support the examiner's findings that there is a continuing need for rail service in the area affected; that abandonment would adversely affect the shipping public; that no long-run losses would be incurred by plaintiff in its over-all system; and that plaintiff is financially able to restore the tunnel. Under these cir-

cumstances, the weight to be given to the evidence and the various factors comprising the public convenience and necessity are for the Commission. Southern R. Co. v. North Carolina (United States v. North Carolina), 84 S.Ct. 564 (1963).

The petition to enjoin, annul and set aside the order of the Commission is denied, and the complaint is dismissed.