**CITY OF NEW YORK, Plaintiff,**
and
**State of New York, Intervening Plaintiff,**
v.
**The UNITED STATES of America et al.,**
**Defendants.**
**Civ. No. 71–C–1639.**

United States District Court,
E. D. New York.

June 7, 1972.

Louis L. Walters, Brooklyn, N. Y. (J. Lee Rankin, Corp. Counsel, Peter C. Demetri, Garden City, of counsel), for plaintiff.

John C. McTiernan, Asst. Counsel, New York State Dept. of Transportation, for intervening plaintiff, State of New York.

Theodore C. Knappen, Washington, D. C., Atty., I. C. C., for defendants, I. C. C. and United States.

G. Clark Cummings, New York City, for defendant, Bush Terminal Railroad.

Before FRIENDLY, Chief Circuit Judge, MISHLER, Chief District Judge, and WEINSTEIN, District Judge.

FRIENDLY, Chief Circuit Judge:

This is a further step in extended administrative and judicial consideration whether Bush Terminal Railroad Company (the Railroad) should be allowed to

abandon its entire operation in Kings County, New York, and Hudson County, New Jersey. The facts surrounding the Railroad's operations, its history, its physical and financial condition through 1969, and its relationship to Bush Universal, Inc., of which it is a wholly-owned subsidiary, and to Bush Terminal Company, Inc., a sister subsidiary, are detailed in our previous opinion in this action, 337 F.Supp. 150 (1972), familiarity with which is here assumed. We there withheld decision on the motion of the City of New York (the City) for a preliminary injunction and remanded the case to the Commission for further administrative action which we found necessary. Specifically, we determined that the record failed to evidence agency "compliance with, in particular, § 102(2) (B) & (D), much less with the detailed requirements of § 102(2) (C)," of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–47, in granting the application for abandonment and that remand to the Commission was necessary in order "for it to bring itself into compliance with the law." 337 F.Supp. at 158–160. Additionally, because of the necessity of remand on the environmental issue and the "substantial element of public interest contained in this case," we directed the Commission also to consider whether a belated $25 per car surcharge offer made by the Bush Terminal Users Association might sufficiently brighten the Railroad's otherwise bleak financial prospects to undermine the case for abandonment. 337 F. Supp. at 160–163. In remanding, we did not vacate Division 3's order and matters have thus proceeded with the Railroad nominally shut down but with its operations temporarily conducted, for most of the period, by New York Dock Railway as developed below.

Consistent with our instructions on remand, the Commission chose to hold further hearings concerning the proposed abandonment and its possible environmental consequences. These were conducted by Hearing Examiner Joseph M. May in New York City on February 28 and 29 and March 1, 2 and 3, 1972. The City and the Department of Transportation of the State of New York (the State) appeared in opposition to abandonment and filed posthearing briefs. For reasons to be discussed subsequently, the Users Association appeared solely for the purpose of withdrawing conditionally its surcharge offer and its protest to abandonment by the Railroad. At the commencement of the hearing, the American Trucking Association, Inc., (ATA) sought and was granted leave to intervene in order to participate fully in consideration of the environmental questions raised by this case.[1] It, too, filed a posthearing brief. Due to the need for expedited action in light of our mandate that the agency act within ninety days, the Commission dispensed with a hearing examiner's report, see 5 U.S.C. § 557(b) (2), and on April 18, 1972, a supplemental report, dated April 14, 1972, by Vice Chairman Gresham on behalf of the Commission was served on the parties. The report ultimately concluded that abandonment of the Railroad's operations was consonant with present and future public convenience and necessity and hence that Division 3's order of December 13, 1971, "should be continued in full force and effect." An appropriate order was entered.

On May 18, 1972, we heard argument concerning the correctness of the Commission's actions and conclusions on remand. At that time, only the plaintiff City and intervenor State appeared in opposition to the abandonment. As indicated in our previous opinion, 337 F.Supp. at 165, we shall now treat the matter as before us on final hearing, F.R.Civ.P. 65 (a) (2).

---

1. The City and the State opposed the intervention of ATA at the hearing on the theory that the result would be an undue broadening of the issues. In its supplemental report, the Commission sustained the hearing examiner's decision noting that ATA's "intervention added to the record some valuable expert testimony and sharpened through cross-examination the views of the other expert witnesses." The correctness of this determination has not here been challenged.

## I.

### *The Surcharge Offer*

Subject to one condition, the Users Association withdrew its $25 per car surcharge offer and its protest because it now appears that New York Dock Railway may permanently take over the Railroad's operations and it was of the opinion that operation of the Bush Terminal area by New York Dock rather than by the Railroad is in the best interest of its members.[2]  The condition it imposed was that New York Dock should in fact assume permanent operation of the Railroad's facilities.  Indeed, it is plain from the record that the User Association's real position is that it wants *some* railroad and it fears that by opposing the Railroad's abondonment it will diminish the chances of New York Dock providing rail service, as that company, which conducts terminal and switching operations in an industrial area some distance to the north of that served by the Railroad, apparently desires.  The City's Department of Ports and Terminals has been engaged in negotiations aimed at permanent operation of the Railroad's facilities by New York Dock. These negotiations have resulted in a Memorandum of Intention, dated January 17, 1972, between the Department and New York Dock.  As an apparent outgrowth of this plus a letter, dated January 24, 1972, embodying an interim agreement between New York Dock and the Railroad, New York Dock commenced temporary operation of the Bush Terminal area on February 4, 1972, pursuant to Service Order No. 1089,

which we have been told is valid until August 1, 1972, and under F.D. No. 27009, it has filed an application for permanent authority to operate the facilities.  We gather from the Memorandum of Intention, the Interim Agreement and statements at argument that such operation is dependent on the terms that can be worked out among New York Dock, the Railroad and the City.

Despite the withdrawal by the Users Association, the surcharge question remains an issue both because of the doubt concerning fulfillment of the condition and for other reasons.  The Users Association comprises only some 30 users.[3] At the February hearing the City called witnesses representing 28 Bush Terminal industries—12 of which in fact are members of the Users Association—and all testified to their willingness to pay a $25 per car surcharge if necessary to secure continued rail service.  Also, the affidavits initially submitted to this court in order to establish the willingness of more than 90 users, representing approximately 7,000 carloads annually, to pay the $25 surcharge were introduced by stipulation of the parties.

█ In directing further consideration of the economic viability of the Railroad's operations in light of the $25 per car surcharge offer, we emphasized the necessity of evaluating this in the context of the most recent financial and traffic data, 1969 having been the last year for which figures were available at the time of the initial June 1970 abandonment hearings.  The Commission determined in its supplemental report that

2.  On February 25, 1972, the Users Association adopted a resolution which read in part:

NOW, THEREFORE, BE IT RESOLVED, that the Association urge the City of New York, its Corporation Counsel, its Economic Development Administration, its Department of Ports and Terminals and all other parties in interest to conclude negotiations and agreements with New York Dock Railway in order that the operation of the railroad by it may be continued uninterruptedly and efficiently; and it is further

RESOLVED, that since the operation of the railroad by Bush Terminal Railroad Company has been so ineffective and unsatisfactory, it is the opinion of the Association that the action of the City of New York to attempt to reinstate Bush Terminal Railroad Company as operators would be inimical to the best interests of the users of the railroad.

3.  The record indicates that of these only six or seven were represented at the meeting at which the February 25, 1972 resolution, see note 2 *supra*, was passed.

in 1970 the Railroad handled 10,500 carloads, yielding revenues of $1,500,000 and a net loss of $226,000, and that in 1971 it handled 7,500 carloads, yielding revenues of $1,250,000 and a net loss of $405,000.[4] Adjusting for a $25 per car surcharge, it concluded that the 1970 net loss of $226,000 would have been reduced to only $25,000. For 1971, the Commission adjusted not only for a $25 surcharge but also for a potential cost saving, estimated at $60,000, due to a union offer to eliminate one train crew, see 337 F.Supp. at 156 n. 6, and for a cost increase, estimated at $50,000, due to retroactive wage increases awarded to the Railroad's employes by the National Mediation Board. The result was that the net loss of $405,000 would be reduced to about $220,000. Given the Railroad's poor financial performance in the eleven years prior to 1970, the Commission's conclusion that the Railroad's "financial condition does not permit it to withstand losses of [the] magnitude" of $200,000 annually comes as no surprise. Moreover, pessimism for the Railroad's future—even with a $25 surcharge—is accentuated by the Commission's conclusion, upon reviewing the condition of the Railroad's market, that "the Bush Terminal area does not have the potential in the foreseeable future to generate the amount of rail traffic which could support applicant's operations." While we do not find the case for abandonment of the Railroad's operations quite so overwhelming as the Commission's supplemental report suggests, a review of the record reveals that the order is supported by substantial evidence.

In certain respects, the Commission's supplemental report appears to be at least misleading—if not simply wrong. According to our mathematics, application of a $25 per car surcharge to the 1970

traffic figure of 10,500 carloads would produce $262,500 in additional revenues and thus would not merely reduce the net loss of $226,000 to a net loss of $25,000 but actually would produce a profit of $36,500. Similarly, the $220,000 net loss for 1971 arrived at by the Commission after application of the surcharge is evidently based upon a 7,000 carload traffic figure when in fact the record is clear that in 1971 the Railroad handled some 7,500 carloads. Furthermore, no attempt was made to adjust for the fact that on December 1, 1971, the Railroad announced an embargo which was effective immediately as to traffic not already en route, and effective December 15, 1971, as to all traffic. This action obviously had an adverse effect on the 1971 traffic figure. A relatively conservative adjustment would raise the 1971 traffic figure to 8,000 carloads which would yield $200,000 in surcharge revenue; after application of the other adjustments, this would reduce the 1971 loss to some $195,000. The Commission's supplemental report also ignores the revelation at the hearing on remand that the 1971 income statement overstated the item "Rent for leased road and equipment" by about $11,000, thus further reducing the adjusted 1971 loss to about $185,000.

The evident uncertainty of these figures would cause us to view the Railroad's case—that the surcharge is not a sufficient remedy for its plight—with some scepticism if it hinged simply on this most recent operating experience. But it does not. Aside from traffic and revenue figures, the Railroad's December 31, 1971 balance sheet shows current assets of $344,022 and current liabilities of $2,705,494. Thus, since 1969, current assets have decreased by more than $100,000 and current liabilities have increased by more than $700,000.[5] The

---

4. These net loss figures were adjusted to exclude certain non-operating expenses resulting exclusively from the abandonment of operations. These totaled approximately $61,000 for 1970 and $126,000 for 1971.

5. At the hearing on remand, the City and the State sought to reopen the record as to the allocation of officers' salaries between the Railroad and related corporate entities and also as to the contractual relationships between the Railroad and its

City contends, on the other side, there was substantial testimony on remand that while the Railroad's tug is now in drydock, it is seaworthy and requires nothing more than normal maintenance; that a sunken float bridge has been raised and its defective pontoon apparently repaired; and that the Railroad's trackage, its locomotives, its maintenance facilities, its floatbridges, and three of its seven carfloats—the other four having been sold for scrap—are actually being used at present by New York Dock. Hence, the City argues, it seems likely that the Railroad could commence operations without much immediate difficulty or expense.[6] But this is strictly a short-term view of the Railroad's equipment situation; in our previous opinion we determined that the Railroad would need $650,000 in the immediate future to rehabilitate its badly deteriorated roadbed and to repair and replace not only marine equipment but also its ancient locomotives. 337 F.Supp. at 154 n. 2. Nothing developed on remand has dispelled the

seriousness of the Railroad's maintenance and replacement problems insofar as continued permanent operation is concerned; even assuming that the surcharge might move the Railroad's current operations near the break-even point, no source for the substantial funds needed for rehabilitation and replacement of equipment—much less for repayment of the Railroad's enormous liabilities—has been identified or suggested.

The main argument pressed by the City and State is that in evaluating the effect of the surcharge, the Railroad's traffic figures must be "normalized." They contend that 1970 and 1971 traffic figures cannot be considered typical because the Railroad's customers have been aware of its intent to abandon operations since mid-1969, and hence, from that time, the users were looking for and turning to alternative modes of transportation. In addition, they point to certain limited evidence elicited on remand which arguably suggests intentional downgrading of service by the Railroad[7]—al-

parent, Bush Universal, Inc., and its sister subsidiary, Bush Terminal Company, Inc. The hearing examiner refused to allow these areas to be explored. Both these issues were the subject of substantial consideration in Examiner Essrick's report, and they were reviewed in our former opinion to delimit the issues on remand. We did not remand on the surcharge issue to give those opposing the abandonment a chance to plug possible holes in the record which were open to examination at the original hearing but only to update the record with respect to the most recent traffic and operating figures. Consequently, the hearing examiner's ruling on these matters was entirely correct.

We also sustain his refusal to enforce two subpoenas served upon the president of the Railroad. The subpoenas had not been obtained from the Commission by means of a petition "showing general relevance and reasonable scope of the evidence sought," and also specifying the documents with "particularity." ICC General Rules of Practice 56, 49 C.F.R. § 1100.56 (Jan. 1, 1972). Moreover, while a hearing examiner may issue subpoenas during a proceeding upon a showing of good cause, id., the City's professed purpose in seeking the subpoenas

was to secure further information concerning the intercorporate transactions between the Railroad and related corporate entities, a matter foreclosed by the limited nature of our remand.

6. Without question, this additional information makes the propriety of the Railroad's unilateral embargo even more doubtful than when we considered it in our prior opinion. The Commission's supplemental report points out, however, that the proper course to test the Railroad's embargo would have been through the Commission's regular complaint procedures. See ICC General Rules of Practice 24–29, 42 C.F.R. § 1100.24–.29 (Jan. 1, 1972). Insofar as the order of abandonment is concerned, we concluded in our previous opinion that on the limited evidence then before the Commission, it was justified in making its order effective immediately, 337 F.Supp. at 164 n. 19, and we see no basis for enjoining abandonment at this juncture merely because it *now* appears that the Railroad indeed might have been able to function for a while longer.

7. There was testimony that a manufacturer of paper products received inadequate service once cars had been delivered to the

though the hearing examiner ruled that issue to be foreclosed by the previous proceedings in this case. For these reasons, the City and State would use the average of the traffic figures for 1969, 1968, and 1967—12,818, 12,068, and 12,414 carloads respectively—to derive a normalized traffic figure of 12,433 carloads. Simply applying a $25 surcharge to this figure would reduce the 1971 loss to slightly more than $70,000, and this would be reduced even more if the underlying revenue figures for 1971 were also "normalized." The Commission summarily dismissed this argument with a footnote stating that the "so-called 'normal year' . . . is a thing of the past."

■ While the normalization argument has some initial appeal, it is evident that even the results obtained by that process would not afford a basis for raising the substantial capital needed in the immediate future to rehabilitate the Railroad's facilities or to reduce the Railroad's liabilities. More fundamentally, normalization fails to meet the harsh reality of the Railroad's market situation,

so bluntly expressed in the Commission's footnote. The prospect of the Railroad's abandonment caused some users to look for alternative modes of transportation, while others moved away completely.[8] However, this is an inevitable consequence of an abandonment application and does not justify normalization unless it appears that denial of the application will bring the traffic back. Here the traffic of these departed users is not readily recoverable. Similarly, neither the City nor the State offered any definitive evidence as to how many users remaining in the Bush Terminal area switched to trucks after learning of the proposed abandonment, but would switch back to rail carriage if such service were permanently assured. There is, in short, no evidence that an upswing in traffic from the 1971 level could be expected by continued operations in the Bush Terminal area;[9] rather, consistent with Hearing Examiner Essrick's original report, all indications are that the area continues to decline, with no sign that the market for rail service will improve in the immediate future.[10]

Railroad's yard; that a wine producer had difficulties in having needed tank cars floated to Brooklyn and connecting railroads eventually took some cars away as a consequence of the delay; and that American Can Company experienced difficulties in obtaining needed hopper cars. However, the extent to which these service failures were the result of conscious efforts by the Railroad's management to discourage business is not clear. Moreover, in the Railroad's defense it should be noted that it retained a traffic solicitor until operations were actually abandoned.

8. The executive vice-president of the Railroad testified as to the large numbers of users which have moved from the Bush Terminal area in 1971 alone. The list included: American Can Company, Dawn Trucking Corp., The Walter Baker Trucking Co., Barrett Lumber, Carp Trucking, Construction Haulage, Paper Warehouse, Hyam Furniture Trucking, J. J. Wilson Trucking, and Modern Biscuit Co. In the year in which these businesses departed, 1971, they alone accounted for some 1,100 of the 7,500 carloads handled by the Railroad.

9. While opportunities for substantial amounts of new business with an overseas shipping firm and a New Jersey malting corporation opened up in 1971, it appears that to obtain this business the Railroad would have to extend its present line to the shipping company's pier a few miles from the Bush Terminal area. More generally, it should be observed that a large container port is planned for the area just north of Bush Terminal and the City hopes for the ultimate redevelopment of the surrounding area. Such expectations for the future, however, come too late to benefit the Railroad.

10. The question, of course, arises why, in light of this, New York Dock Railway is seeking permanently to assume the Railroad's operations. At oral argument, counsel for the Commission suggested that operation of the Bush Terminal area by New York Dock is feasible because it has lower labor costs than the Railroad, but the record casts no light upon this. Since New York Dock is already engaged in a similar float operation to the north of Bush Terminal, economies of scale may be an answer. Looking to the future, New

In this respect, this case differs materially from those relied upon by the State as authority for normalizing traffic figures. In Missouri Pacific R. R. Co. Abandonment Crete Branch, 307 I.C. C. 189 (1959), the level of traffic on a freight branch in an agricultural area had been abnormally distorted for a number of years as a result of a severe drought and the temporary, local storage of large amounts of grain, but more recent experience indicated that traffic was on the rise. Consequently, the Commission rejected the assumption that the branch could not be operated profitably. In Southern Pacific Company Discontinuance, 333 I.C.C. 525, 556–58 (1968), the Commission refused to consider "recent patronage decline as evidence of a hopeless long-run outlook" for a passenger operation, where service had been allowed to deteriorate. However, there a substantial passenger market was found to exist, *id.* at 558; the railroad was not making a reasonable effort to tap it. Here, in contrast, the Railroad's market has, in large measure, simply moved away.

■ As to any question of intentional downgrading of service, it must be recognized that in the case of a railroad in such poor condition as this one, both physically and financially, the question whether a particular instance of failure in service is the result of design or merely the unfortunate product of failure in equipment or efforts at cost savings is difficult to ascertain. See 337 F.Supp. at 155. Given that the Railroad's difficulties extend back to 1959,

the most significant factor in this case is that Hearing Examiner Essrick's 1971 report rejected the suggestion that the Railroad's declining business was due to the intentional downgrading of service. It was not our intention to foreclose investigation of the question of downgrading on remand in determining the Railroad's actual traffic levels for 1970 and 1971, and we regret that the hearing examiner barred full development of the matter. What evidence the supplemental record does arguably contain on the question, see notes 7 & 9 *supra,* is ambiguous and serves primarily to highlight the difficulty of determining the presence of purposeful management effort to discourage business—particularly once users are alerted and sensitive to the carrier's desire to abandon. In any event, the record does convince us that any possible intentional downgrading by the Railroad in 1970 and 1971 was only one small aspect of a rapidly deteriorating market situation—as reflected in the most recent traffic figures—otherwise beyond the Railroad's control. We therefore see no reason to remand once more simply for further exploration of the downgrading issue.[11]

## II.

### *Environmental Impact*

Together with its order directing further hearings following remand, the Commission issued a draft environmental impact statement to provide a basis for exploration of the environmental consequences of the Railroad's abandonment at the hearing.[12] Subsequently, the

---

York Dock may hold hope for economic improvement in the area, see note 9 *supra,* and have the financial capability to await those better times. The Railroad does not.

11. A final point which the argument of the City and State ignore is that to look at 1967, 1968, and 1969 traffic figures on the theory that the Railroad's market was stable until 1969 is at odds with the facts that since 1959 the Railroad's traffic has been generally decreasing, while its losses have been increasing. See 337 F.Supp. at 155.

12. The Commission served the draft impact statement on the Director of Impact Statements Office, Environmental Protection Agency; the Chairman, Council for Environmental Quality; the Assistant Secretary for Systems Development and Technology, Department of Transportation; the Assistant Secretary for Environment and Urban Systems, Department of Transportation; and the Assistant Secretary for Health and Science Affairs, Department of Health, Education, and Welfare. See NEPA § 102(2) (C), 42 U.S.C. § 4332(2) (C). No comments were received from these officials,

City's position before the Commission was that under the Clean Air Act, 42 U.S.C. § 1857 et seq., the National Primary Ambient Air Quality Standards must be met in the metropolitan area by 1974 or the federal government can mandate a solution, and that in the area of Brooklyn where Bush Terminal is located, air pollution is at its worst, with the particulates standard being exceeded by 120 percent. The City does not consider the industry presently located in the Bush Terminal area to be an important source of air pollution. Nor does it anticipate that the new industry which it hopes to attract to the area as a part of its redevelopment efforts, see note 9 *supra,* will contribute significantly to the problem. However, it argues that, absent rail service, 35,000 additional trucks annually will be operated in the Bush Terminal area—and this does not take into account the ultimate effect of its redevelopment plans. It is this potential for a large influx of new vehicular traffic which alarms the City; operating on the assumption that 60 percent of the additional trucks would be diesel powered and 40 percent gasoline powered, it estimated that the associated emissions would be 19,000 tons of carbon monoxide, 400 tons of particulates, 5,200 tons of nitrogen oxides, and 2,200 tons of hydrocarbons.

The Railroad attempted to demonstrate that the abandonment would have no adverse environmental effect. It contended that essentially all trucks introduced to replace the discontinued rail service would be diesel powered; that the freight previously handled by it could be transported by 14 vehicles operating through each eight hour working day, in contrast to the City's figure which re-

flects 33 vehicles so operating; and that, all else being equal, the smaller but more numerous truck engines would generate no more pollution than the Railroad's locomotive diesel engines.[13]

On the basis of the supplemented record, the Commission concluded that two primary factors associated with abandonment might increase air pollution in the Bush Terminal area: "(1) the substitution of the present rail service by trucks using gasoline engines; (2) the possible increase in fuel consumption, and thus emissions, by diesel trucks substituted for diesel trains." With respect to the potential impact of the first factor, it recognized that "the gasoline engine produces a much greater level of certain pollutants [in particular, carbon monoxide and nitrogen oxides] than its diesel counterpart," but found that "heavy-duty, diesel-powered trucks would be the primary mode of transportation in the [Bush Terminal] area, not gasoline-powered trucks." As to increased consumption of diesel fuel, the Commission observed that the Railroad's effort to equate the amount of pollution generated by its diesel locomotives with that from the trucks which would replace those locomotives ignored the fact that the locomotives operated over a distance of only 1.8 miles to move cargo from the Bush Terminal area to the carfloats operating to the New Jersey Terminal, whereas to move cargo between the same two points by truck would involve a trip of either 12 or 25 miles.[14] Hence, the Commission considered it "reasonable to assume that a number of trucks greater than the number of trains presently being used, traveling a greater distance than the trains presently operate, would consume more fuel than the trains now con-

---

although the Regional Chief of the Environmental Protection Agency's Air Programs Branch testified at the February-March hearing.

13. ATA's basic concern, which motivated its intervention before the Commission, was the possible "approval of what it considers an erroneous assumption that diversion of traffic from railroads to trucks would automatically increase air pollution,

either under the particular facts of this [case] or generally."

14. The shorter route would involve travel through very congested portions of Manhattan; the longer route, over the Verrazzano Bridge, would mean less travel in congested areas, although significant congestion would be encountered on this route in the vicinity of Bush Terminal.

sume." However, it further noted that "in the area of prime concern, the Bush Terminal region in Brooklyn, the trucks would be traveling approximately the same distance as the trains." In addition, the Commission observed that any possible adverse effect upon air pollution as a result of the abandonment may be ameliorated—if not avoided completely—by the continued provision of rail service in the Bush Terminal area by New York Dock; by the departure of users from the area if rail service ceases; and by the reduction in truck traffic as a result of the elimination of the secondary truck traffic of rail users who do depart. Considering all these factors, the Commission believed its "conclusion must be that the proposed abandonment will not have a significant environmental impact." [15] In addition, it applied the balancing test suggested by Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 449 F.2d 1109, 1113 (D.C.Cir.1971), and concluded that the serious economic plight of the Railroad outweighed whatever minimal harm to the environment might result from the abandonment. The Commission modified its draft environmental impact statement to reflect its conclusions, and by reference incorporated in the final statement the portion of its supplemental report analyzing the environmental consequences of abandonment.

■ The crux of our remand of this case to the Commission was that in permitting abandonment of the Railroad's operations, it had failed to follow the detailed steps prescribed in § 102(2) of NEPA, 42 U.S.C. § 4332(2), which were designed to compel full agency exploration and evaluation of the environmental consequences of contemplated action and

thus to ensure that the initial decision-maker acted in full awareness of those consequences. See 337 F.Supp. at 160. See also Greene County Planning Bd. v. FPC, 455 F.2d 412, 419–420 (2 Cir. 1972); Calvert Cliffs', supra, 449 F.2d at 1112–1114, 1118–1119. As suggested by our action, an important aspect of judicial review of agency action under NEPA is of a procedural nature, i. e., to ascertain that the agency has "fully and in good faith" considered all of the factors and appropriately followed all of the steps mandated by NEPA, see Calvert Cliffs', supra, 449 F.2d at 1115. Clearly, the Commission has now fulfilled its obligation in this respect

Although not compelled to do so by the terms of our remand, see 337 F.Supp. at 164, the Commission held five days of hearings, a substantial portion of which were focused on the environmental questions. All parties were given full opportunity to present expert evidence on the environmental aspects of the case. As is evident from our brief summary of the Commission's evaluation of the supplementary record and the parties' contentions, it has now taken the "hard look" at the potential environmental consequences of the abandonment which NEPA contemplates. See Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827 (D.C.Cir. 1972). Beyond this, from its evaluation, the Commission has prepared a final statement detailing the abandonment's environmental impact. See NEPA § 102(2) (C). Each area of environmental concern specified in § 102(2) (C) has received its attention. While the final impact statement is terse and of a conclusory nature, compare Hanly v. Mitchell, 460 F.2d 640 (2 Cir. 1972), it is merely the end result of the Com-

---

15. Although the focal point of the environmental issue in this case has been air pollution, the Commission also found that there was little evidence that any substantial amount of soil, water, or noise pollution, or land pollution due to growth would result from the abandonment. It estimated that similar quantities of diesel fuel would be consumed whether rail or truck carrier were used. Finally insofar as § 102(2) (C) (iv) of NEPA requires long-term productivity to be evaluated, the Commission concluded "that the closing of businesses and reduction of employment for the unskilled will not enhance that long-term goal."

mission's extensive analysis—which was incorporated by reference—of the large amount of environmental evidence introduced before the hearing examiner. As noted earlier, the Commission also prepared a draft impact statement in advance of the hearing. This procedure was consonant with that mandated in Greene County Planning Bd. v. FPC, *supra*, 455 F.2d at 422, where the Second Circuit held that the FPC violated "NEPA by conducting hearings prior to preparation by *its staff* of its own impact statement." The net effect of the Commission's studied adherence to § 102 (2) (C) of NEPA on remand has been— as Congress appears to have intended— "to aid in the [agency's] own decision-making process and to advise other interested agencies and the public [, see note 12 *supra*,] of the environmental consequences of planned federal action." *Calvert Cliffs', supra*, 449 F.2d at 1114.

█ The State nevertheless seems to argue that because the Commission's analysis was couched in terms of alternatives and evidenced some uncertainty as to the precise environmental consequences of abandonment, it falls short of the level of refined and systematic consideration required by NEPA, cf. *Calvert Cliffs', supra*, 449 F.2d at 1113. We disagree. Because of the very nature of this case, the Commission had to grapple with a large number of factors which are not readily reduced to certainty, *e. g.*, the ratio of diesel to gasoline trucks; the probability of continued rail service in the Bush Terminal area by New York Dock; the number of users who will depart from the area if abandonment occurs; and the effect of the departure of users on secondary truck traffic. But the Commission's report evidences no uncertainty as to its ultimate conclusion that, in light of all relevant factors, the abandonment "will not have a significant environmental impact."

The State also suggests that the Commission erred in limiting its consideration of the environmental impact of the abandonment to the Bush Terminal area. "[C]rabbed" administrative interpreta-

tion of NEPA has been thoroughly castigated. See *Calvert Cliffs', supra*, 449 F.2d at 1117–1119. But this is not such a case. The Commission gave consideration to the full spectrum of possible environmental consequences of abandonment, see *supra* & note 15. While the Commission naturally focused on the Bush Terminal area since this is where the Railroad operates, its report recognized evidence of environmental consequences elsewhere in the New York area due to increased truck traffic, see note 14 *supra*, and we thus think it reasonable to conclude that consideration of this evidence is implicit in the balance finally struck by the Commission between the economic and environmental factors at play in this case.

█ Having determined that the Commission has now complied with the letter of NEPA, our remaining function with respect to the agency's substantive conclusions is extremely limited. Under NEPA, responsibility for evaluation and consideration of the environmental consequences of abandonment resides in the first instance with the Commission. Compare, e. g., Greene County Planning Bd. v. FPC, *supra*, 455 F.2d at 420; *Calvert Cliffs', supra*, 449 F.2d at 1119. As observed in another case involving substantial environmental issues, albeit before the passage of NEPA, "[t]his court cannot and should not attempt to substitute its judgment for that of the Commission." Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2 Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). Normally, of course, judicial review of the merits of an ICC abandonment order is governed by the standards expressed in § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, see, e. g., Northwestern Pacific R. R. Co. v. United States, 228 F.Supp. 690 (N.D. Cal.) (three-judge court), aff'd per curiam, 379 U.S. 132, 85 S.Ct. 274, 13 L.Ed. 2d 333 (1964); Cobb v. United States, 297 F.Supp. 169 (M.D.Pa.1969) (three-judge court), and thus is generally limited to determining, in essence, whether the Commission's findings and conclu-

sions are supported by substantial evidence and are not an abuse of discretion. We seriously doubt, however, that the merits of the Commission's determinations under NEPA are subject to even that degree of review. NEPA itself contains no requirement that an agency hold hearings to investigate the environmental consequences of proposed action, and does not specify that findings are necessarily to be made.[16] Moreover, NEPA is often applicable to agency decision making where adjudicatory proceedings are not required. See, e. g., Hanly v. Mitchell, *supra*, 460 F.2d at 640; Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D.Ore.1971); Scherr v. Volpe, 336 F.Supp. 886 (W.D.Wis.1971). No formal record is contemplated in such situations and the function of the courts is thus necessarily limited. Compare Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414–415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). To ensure implementation of the national environmental policy, see NEPA § 101, 42 U.S.C. § 4331, procedures were prescribed in § 102(2) to compel administrative exploration and consideration of environmental consequences. Once it is determined in any particular instance that there has been good faith compliance with those procedures, we seriously question whether much remains for a reviewing court. In this vein, it has been suggested that "reviewing courts probably cannot reverse a substantive decision on its merits, under [NEPA], unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental factors." *Calvert Cliffs', supra*, 449 F.2d 1115.[17] However, we find it unnecessary to do more than suggest this question now, since the Commission has in fact compiled a substantial record and arrived at findings concerning the environmental consequences of the abandonment which would pass under the standard of review normally applied to abandonment orders.

There was substantial evidence to support the Commission's findings, *inter alia*, that the trucks replacing rail service would be primarily diesel operated; that diesel fuel consumption would not significantly increase in the Bush Terminal area itself; and that the departure of substantial numbers of users from the Bush Terminal area would limit the increase in truck traffic and would also reduce existing secondary truck traffic.

The root of the disagreement of the City and State with the Commission's substantive conclusions under NEPA appears to be that it improperly balanced the environmental consequences of abandonment against the economic consequences of continued operation by the Railroad. Although, as developed in detail in Part I, the Railroad's economic

---

16. In this respect, it is of interest that, as a part of the legislative compromise which resulted in the final version of NEPA, the requirement of "a *detailed statement* by the responsible official" set forth in § 102(2) (C) was substituted for a requirement of "a *finding* by the responsible official." See 115 Cong.Rec. 29058 (Oct. 8, 1969) (emphasis added). The relevant Senate and House reports were prepared before this substitution was made; the Conference report in discussing § 102 does not comment on the change in language. See Conf.Rep. No. 91–765, 91st Cong., 1st Sess. (1969). NEPA's sponsor, Senator Jackson, in discussing this and other changes on the floor of the Senate, remarked:

> The agreed-upon changes  .  .  .
> would change the language of some of

[102's] requirements, but their substance would remain relatively unchanged.

115 Cong.Rec. 29055 (Oct. 8, 1969).

17. More recently, the same court expressed the same thought in slightly different terms:

> So long as the officials and agencies have taken the "hard look" at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken.

Natural Resources Defense Council, Inc. v. Morton, *supra*, 458 F.2d at 838. (footnotes omitted).

prospects with a $25 surcharge might be marginally better than suggested by the Commission's report, no significant hope for turning the Railroad around financially has been established; the annual loss which it could anticipate remains in the range of $200,000—the value relied upon by the Commission—apart from any consideration of its need for large sums for new capital investment and reduction of its substantial liabilities. Hence, we would find it impossible to reverse the Commission on this issue even if the ordinary standard of review applied.[18]

### III.

*Lessor's Obligations and Labor Protective Conditions*

In our previous opinion, we deferred decision as to "whether the Commission was correct in concluding that the order of abandonment should not have been conditioned upon resumption of operations by the [parent Bush Universal, Inc., or the sister subsidiary Bush Terminal Company, Inc.], or in refusing to impose labor protective conditions" in conjunction with the order of abandoment. 337 F.Supp. at 157 n. 8.

Subsequent developments have eliminated any necessity for dealing with the first issue. Since our original opinion, the City has filed a separate action in this court, pursuant to § 1(18) and (20) of the Interstate Commerce Act, to compel Bush Universal, as a lessor allegedly formerly engaged in common carrier operations, to resume the operations abandoned by the Railroad. City of New York v. Bush Universal, Inc., Civ. No. 72–C–157. On February 17, 1972, Judge Weinstein referred the matter initially to the Commission which commenced a new proceeding to determine Bush Univer-

sal's obligation as lessor. Status of Bush Universal, Inc., F.D. No. 27026.

In our previous opinion, we summarized Hearing Examiner Essrick's reasoning as to the inappropriateness of imposing labor protective conditions in the context of this abandonment. 337 F.Supp. at 154. We can add nothing useful to his detailed evaluation except to note that imposition of labor protective conditions is a matter within the Commission's discretion, see ICC v. Railway Labor Executives Ass'n, 315 U.S. 373, 380, 62 S.Ct. 717, 86 L.Ed. 904 (1942), and this has not been abused under the circumstances of this case, despite the regrettable hardship the Railroad's employees will doubtless suffer.

The short of the matter, on all issues in this case, thus remains, as we said in our previous opinion, 337 F.Supp. at 155:

> Courts are not free to annul the Commission's decision to allow abandonment under such circumstances simply because greater wisdom at an earlier date on the part of all concerned might have preserved a valuable transportation enterprise.

The order of the Commission is sustained, and the complaint is hereby dismissed. Each party will bear its own costs.

WEINSTEIN, District Judge (concurring):

I concur on the grounds that there is substantial evidence to support the Commission's findings and conclusions and that there has been no abuse of discretion. On this record, there is no need to express "doubt . . . that the merits of the Commission's determinations under NEPA are subject to even that degree of review." The issue was neither briefed nor argued.

18. We thus have no occasion to consider the constitutional question suggested in 337 F.Supp. at 160.