**STUDENTS CHALLENGING REGULATORY AGENCY PROCEDURES (S.C.R.A.P.), Plaintiff,**

and

**Council on Environmental Quality, Involuntary Plaintiff,**

and

**Environmental Defense Fund et al., Plaintiff-Intervenors,**

and

**National Association of Secondary Materials Industries, Inc., et al., Plaintiff-Intervenors,**

and

**Institute of Scrap Iron and Steel, Inc. and Julian C. Cohen Salvage Corporation, Plaintiff-Intervenors,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**The Aberdeen and Rockfish Railroad Company et al., Defendant-Intervenors.**

Civ. A. No. 971-72.

United States District Court, District of Columbia.

Feb. 19, 1974.

John F. Banzhaf, III, and Peter H. Meyers, Washington, D.C., for plaintiff SCRAP.

John F. Dienelt and Scott H. Lang, Washington, D.C., for plaintiff-intervenors Environmental Defense Fund and others.

Edward L. Merrigan, Washington, D. C., for plaintiff-intervenors National Association of Secondary Materials Industries, Inc. and others.

Thomas H. Boggs, Jr., George Blow, and E. Bruce Butler, Washington, D.C., for plaintiff-intervenors Institute of Scrap Iron and Steel, Inc., and others.

Asst. Atty. Gen. Shiro Kashiwa, Harold H. Titus, Jr., U. S. Atty., and William M. Cohen, Atty., Dept of Justice, for defendant United States of America.

Fritz R. Kahn, Gen. Counsel, Betty Jo Christian, Associate Gen. Counsel, and Theodore C. Knappen, Hanford O'Hara, Charles H. White, Jr., and James F. Tao, Attys., Interstate Commerce Commission, for defendant Interstate Commerce Commission.

T. A. Miller, San Francisco, Cal., Albert B. Russ, Jr., Richmond, Va., Edward A. Kaier, Philadelphia, Pa., and Charles A. Horsky, Michael Boudin, Mi-

chael J. Henke, Walter Hellerstein and James L. Tapley, Washington, D.C., for defendant-intervenors Aberdeen and Rockfish Railroad Company and others.

Before WRIGHT, Circuit Judge, and RICHEY and FLANNERY, District Judges.

J. SKELLY WRIGHT, Circuit Judge:

Plaintiff and plaintiff-intervenors challenge an order of the Interstate Commerce Commission (ICC) authorizing railroad rate increases on shipment of recyclable commodities on the ground that the Commission has failed to comply with the prescriptions of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (1970). Both plaintiffs and defendants have moved for summary judgment. We find that the Commission's efforts to meet the commands of NEPA were substantially deficient. We thus vacate the Commission's order authorizing the rate increases on recyclable commodities and remand the proceeding to the Commission for fulfillment of its NEPA obligations. However, because of our uncertainty concerning the meaning of the Supreme Court's decision last term in Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), we refrain from issuing an injunction restraining the railroads from collecting the increased rates pending the Commission's reconsideration.

I

This case has had a long and complicated history. Inasmuch as it has produced two previous opinions[1] by this court[2] and one by the Supreme Court,[3]

however, we shall attempt to set forth only those facts relevant to the motions now before us. Having secured Commission approval of a two and a half per cent temporary emergency surcharge in February 1971 on nearly all freight rates, the nation's railroads on March 17, 1972 filed tariffs with the Commission for permanent selective increases averaging four per cent on most commodities. Under the Interstate Commerce Act tariff changes filed by carriers go into effect automatically unless the Commission deems that an investigation of the lawfulness of these tariffs is advisable and that the rates should be suspended pending such an investigation. 49 U.S.C. § 15(7) (1970). On April 24, 1972 the Commission announced its intention to investigate the permanent increases and suspended these increases for the full seven-month period permitted by Section 15(7).

Students Challenging Regulatory Agency Procedures (SCRAP) then commenced this action, contending that NEPA compelled the Commission to prepare and consider an environmental impact statement before permitting any rate increases—including the temporary two and a half per cent surcharge. SCRAP, which was later to be joined by other environmental groups and scrap dealer associations,[4] argued that the rate increases discouraged the environmentally desirable use of recyclable commodities not only by raising the costs of shipping recyclables, but also by aggravating "the preexisting disparity in shipping costs between these materials and the primary goods with which they compete."[5] In response to this theory, we held that even the temporary surcharge was a major action "significantly

---

1. 353 F.Supp. 317 (1973); 346 F.Supp. 189 (1972).

2. This is a three-judge court convened pursuant to 28 U.S.C. §§ 2325 & 2284 (1970).

3. United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

4. SCRAP, an unincorporated association of law students, was formed to enhance environmental quality. The Environmental De-

fense Fund, the National Parks & Conservation Association, and the Izaak Walton League of America entered the action in its initial stages as plaintiff-intervenors. The National Association of Secondary Materials Industries and the Institute of Scrap Iron & Steel have more recently intervened. All of these parties will be referred to hereinafter as plaintiffs.

5. 346 F.Supp. at 191.

affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), and that the Commission therefore had violated NEPA by not preparing and considering a NEPA impact statement before issuing its order permitting the temporary surcharge. We held that any challenge to the permanent increase was not ripe for review inasmuch as the Commission had not then yet issued an order approving this increase. We did, however, retain jurisdiction to ensure that the Commission would comply with NEPA.[6] We further issued a preliminary injunction restraining the temporary surcharge insofar as it applied to recyclable commodities. The Supreme Court reversed the injunction on June 18, 1973. United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Relying on Arrow Transportation Co. v. Southern R. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), the Court held that Section 15(7) vested exclusive jurisdiction in the Commission to suspend rates pending its final decision on their lawfulness.[7]

Meanwhile the Commission's investigation of the proposed permanent increases culminated in a hearing consisting of submission of briefs and oral argument by concerned parties. Though the Commission had told the Chief Justice, in connection with its application for a stay of our order against the temporary surcharge, as well as this court, that it was developing an impact statement, no statement was prepared for consideration at this hearing or even for consideration by the Commission before issuing its decision on the permanent increases. That decision, which was issued October 4, 1972, approved most of the selective increases. Ex Parte No. 281, Increased Freight Rates and Charges, 1972, 341 ICC 288 (1972). The decision included some discussion of environmental considerations and limited the rate increases on *nonferrous* scrap to three per cent, but it generally concluded that the new tariffs would not significantly affect the quality of the human environment and that there was thus no necessity for a formal impact statement. The Commission's failure to prepare a formal statement provoked vehement protestations from the President's Council on Environmental Quality (CEQ), from the Environmental Protection Agency (EPA), and from plaintiffs.[8] Plaintiff SCRAP filed with this court on November 7, 1972 a motion to enjoin the approved increases. On the same day as this filing, the Commission suddenly shifted its position by suspending, until June 1973, rate increases on all goods being shipped for purposes of recycling and by reopening its investigation in Ex Parte No. 281.[9] The Commission stated that the proceeding was reopened for "the limited purpose of further evaluating, in accordance with [NEPA], the environmental effects of increased railroad freight rates and charges on the movements of commodities being transported for the purpose of recycling * * *."[10] In light of the Commission's action, we denied SCRAP's request for a preliminary injunction. We found that no relief was necessary for the suspended increases on recyclables and that there was not sufficient likelihood that the plaintiffs would be successful in showing that an impact

---

6. *Id.* at 198–201.

7. 412 U.S. at 690–699, 93 S.Ct. 2405.

8. " * * * The Environmental Protection Agency (EPA) stated its regret that the Commission chose not to submit a formal impact statement, arguing that 'the historical data presented by the Commission does not support the conclusion that * * * there will be no adverse environmental impact.' CEQ, in its letter to the Commission, felt that the conclusion that the October 4 order would have no significant environmental impact 'seems unresponsive to the language of our NEPA guidelines * * *.' " 353 F.Supp. at 321.

9. Following the Commission's Oct. 4 order and opinion, the railroads refiled their increases, including the increases on recyclables, in accordance with the order and the exceptions they made to the Commission's general approval. It was these refiled tariffs as they related to recyclables which the Commission suspended.

10. 353 F.Supp. at 321.

statement was required before increasing rates on nonrecyclables. We reserved decision on the merits.

The Commission proceeded to prepare its statement on the environmental impact of the recyclable rate increases. The Commission's draft statement was issued March 5, 1973. It was circulated to several concerned Executive agencies and departments and to all of the parties in this action. Not only the plaintiffs but also the Executive agencies and departments, including EPA, CEQ, General Services Administration, Department of the Interior, and Department of Commerce, responded with extensive comments critical of this draft statement and its conclusions. These comments, although acknowledged by the Commission in its final statement, did not move the Commission to change in any substantial way its conclusions or even its analysis. The Commission denied the request of plaintiffs to schedule a new set of hearings in the reopened proceedings. The Commission served its final environmental impact statement on May 7, 1973. The statement's analysis was limited to the marginal impact of the most recent rate increases; it stated that a general rate increase proceeding did not provide an appropriate occasion to examine whether the underlying rate structure discriminated against recyclable commodities with significant adverse environmental consequences.[11] Though it contained no rigorous economic analysis of the responsiveness of the demand for recyclables to changes in transportation costs, the statement's conclusion echoed the Commission's original position in its October 1972 order that the increases would not have a significant adverse effect on the environment. The statement further pronounced that even if some adverse environmental impact could be anticipated[12] the increases

would be justified by the need to ensure a viable and efficient railroad system. The Commission did not use this staff-prepared statement and the critical comments on the draft statement to develop a new opinion to supplant or even supplement its October opinion. Instead the Commission merely appended a one-sentence order to the statement's back page which adopted the entire statement as part of its prior opinion on the rate increases and discontinued Ex Parte No. 281.

On May 30, 1973 SCRAP and plaintiff-intervenor Environmental Defense Fund (EDF) filed a motion in this court for a preliminary injunction against the rate increases on recyclable commodities which the railroads intended to place in effect when the suspension period ended on June 10. On June 7 this court, finding a sufficient likelihood that plaintiffs would be successful in their present challenge to the rate increases, issued a temporary injunction restraining the Commission and the railroads from collecting the increases "until further order of this court." This injunction was stayed by Chief Justice Burger. On November 19, 1973 the Supreme Court vacated the injunction and remanded the case to this court for further consideration in light of Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade, *supra*.[13]

Plaintiffs now ask this court for: a declaration that the ICC has failed to comply with NEPA and that the orders approving the increases are thus void; an order enjoining the Commission to reconsider the general rate increases in accordance with the strict demands of NEPA; and an injunction forbidding the railroads from collecting the rate increases on recyclables until the Commission does so comply with NEPA. Plaintiffs and defendants have filed cross mo-

---

11. ICC, Ex Parte No. 281, Increased Freight Rates and Charges, 1972 (Environmental Matters) 22 (May 7, 1973) (hereinafter "Environmental Impact Statement").

12. The statement actually did concede at one point that the rate increase would prob-

ably cause a decline in utilization of glass scrap. *Id.* at 155.

13. United States v. SCRAP, 414 U.S. 1035, 94 S.Ct. 533, 38 L.Ed.2d 326 (1973).

tions for summary judgment, and on these motions we now consider whether it is appropriate for this court to grant plaintiffs' requests for relief.

## II

■ We must first address the contention of the railroads, who have intervened as defendants, that we lack jurisdiction to review the Commission's compliance with the commands of NEPA. The railroads' position is based on cases dating back almost 40 years which refused to review challenges of shippers to general revenue orders like those of October 4, 1972 and May 2, 1973.[14] These decisions were not compelled by any statutory limitation on the courts' power; three-judge District Courts have jurisdiction "to enforce, suspend, enjoin, annul or set aside in whole or in part any order of the Interstate Commerce Commission * * *." 28 U.S.C. § 2321 (1970); 28 U.S.C. § 1336 (1970). See 28 U.S.C. §§ 2322–2325 (1970). The decisions were instead predicated upon the judicially developed doctrines of ripeness and exhaustion of administrative remedies. The courts stressed that the Commission's approbation of a general rate increase under Section 15(7) was merely an acceptance of the railroads' need for more revenue, that the shippers could challenge the reasonableness of particular rates affecting them under Sections 13(1), 15(1) and 16(1) of the Interstate Commerce Act, 49 U.S.C. §§ 13(1), 15(1), 16(1) (1970), and that only in a decision pursuant to such a challenge did the Commission render a judgment on the reasonableness of particular rates as applied to particular shippers. The courts thus reasoned that to review carriers' challenges to a Section 15(7) order would be to interfere at an intermediate stage in the rate-making process before the carriers had exhausted their remedies before the Commission.

However, as we indicated in our first opinion in this case,[15] we do not feel restrained by these cases from reviewing plaintiffs' challenges to the Commission's orders. First, the precedential force of the cases is now in substantial doubt. Two of the most recent, Alabama Power Co. v. United States, D.D. C., 316 F.Supp. 337 (1969), and Atlantic City Electric Co. v. United States, S.D. N.Y., 306 F.Supp. 338 (1969), were affirmed without opinion by only an equally divided Court, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970). Only last term the Court indicated that the jurisdictional question presented by these cases, while a serious one, was not settled.[16] In Alabama Power and Atlantic City the shippers' challenges were directed to the Commission's decision that the general increases were warranted by the railroads' revenue needs rather than to the reasonableness of any particular rates. We adhere to the view expressed in the dissent in Alabama Power that challenges such as these can best be considered in direct review of the Commission's Section 15(7) decision rather than "in countless rate-making proceedings involving individual commodities."[17] The instant case does not present challenges

14. See, e. g., Algoma Coal & Coke Co. v. United States, E.D.Va., 11 F.Supp. 487 (1935); Koppers Co. v. United States, W. D.Pa., 132 F.Supp. 159 (1955); Atlantic City Electric Co. v. United States, S.D.N.Y., 306 F.Supp. 338 (1969), and Alabama Power Co. v. United States, D.D.C., 316 F.Supp. 337 (1969), both affirmed by equally divided Court, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970); Electronic Industries Assn v. United States, D.D.C., 310 F.Supp. 1286 (1970), affirmed per curiam, 401 U.S. 967, 91 S.Ct. 1188, 28 L.Ed.2d 318 (1971).

15. 346 F.Supp. at 198.

16. In Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), the Court reviewed a Commission order that particular rates were just and reasonable. The plurality opinion stated that if the grain charges "were just like a general rate increase, serious questions would arise about the jurisdiction of the District Court to review the Commission's order." Id. at 814 n. 10, 93 S.Ct. at 2378.

17. Alabama Power Co. v. United States, supra note 14, 316 F.Supp. at 339.

to the reasonableness of particular rates on particular railroads between particular points; it presents challenges to the Commission's determination that the railroads' general revenue needs justify the costs to shippers and to the environment of a general rate increase on recyclables.[18] The Commission has made what it believes to be its final decision on this general balancing; it surely does not intend to reconsider this decision after a Section 13 challenge to a particular rate.

We do not, however, rest on an application of the analysis advanced in the dissent in *Alabama Power*. For as stated in our first *SCRAP* opinion,[19] the cases cited by the railroads are all distinguishable from a case challenging the Commission's compliance with NEPA in approving a general rate increase. We first note that however adequate a Section 13 proceeding might be to a shipper who questions the railroads' need for a general rate increase, it is at least questionable that environmental groups such as SCRAP have standing to initiate Section 13 proceedings during which they could attempt to contest the Commission's compliance with NEPA. Sections 13(1), 15(1) and 16(1) permit any person or association to complain of carrier action in contravention of the Interstate Commerce Act and empower the Commission to investigate such complaints and remedy any violation of the Act, including granting reparations for unreasonable or prejudicial charges on particular items shipped. It is suggested that an environmental group, while it could not obtain reparations, should be able to complain that a particular charge on a particular item is unreasonable because of its environmental effects. Thus if SCRAP could initiate an investigation on this theory, it could argue fur-

ther that before rejecting the complaint the Commission would have to prepare and consider an environmental impact statement. But we know of no Commission order or judicial opinion accepting this theory and it is thus too speculative and too unrealistic to support a denial of jurisdiction. It is true that two scrap dealers associations have intervened in this action to help champion the environmental cause and that these associations or their members may bring Section 13 challenges to particular rates which they could argue the Commission could not reject without compliance with NEPA. But we cannot rest a holding on the fortuity that here shippers as well as environmental groups challenge the Commission's compliance with NEPA. Moreover, to refuse to consider the challenges of environmental groups to agency compliance with NEPA because economically interested parties might make similar challenges in later proceedings would significantly dilute the Supreme Court's holding, on review of our first opinion in this case, that SCRAP has full standing, equal to and not derived from the standing of economically interested parties, to seek review of Commission action which allegedly harms SCRAP's members in their use of the environment.[20]

Even if environmental groups could initiate proceedings pursuant to Section 13(1), an appeal from a Commission order on the reasonableness of a particular rate would not be an appropriate time for a court to review the Commission's challenged compliance with NEPA. Plaintiffs have persuasively argued that NEPA compels the Commission, before approving a general rate increase, to consider whether the rate increases on recyclables collectively have a significant environmental impact and, if so, whether this impact is justified by the rail-

18. We thus find misplaced the railroads' reliance on Electronic Industries Assn v. United States, *supra* note 14, which was affirmed unanimously by the Supreme Court without opinion. In that case the shippers attacked as unreasonable and arbitrary only that portion of a Commission § 15(7) order

permitting increased rates on two particular items. 310 F.Supp. at 1287.

19. 346 F.Supp. at 198.

20. United States v. SCRAP, *supra* note 3, 412 U.S. at 683–690, 93 S.Ct. 2405.

roads' need for increased revenues. These are far different questions from whether a particular rate, in light of environmental considerations, is unreasonable or discriminatory. Even if a court in reviewing a Commission order on the reasonableness of a particular rate were able on the record before it to review the Commission's compliance with NEPA, the court's decision would affect only the particular rate challenged. Thus burdensome relitigation of each particular rate would be required to challenge all the rates which collectively impact the environment. Finally, we note that delay is of greater import here than in previous cases where review of general rate orders was refused. While the Act provides for reparations to shippers who successfully challenge particular rates after they have become effective, the environmental degradation which continues while challenges to particular rates are being considered may not be reparable at all.

Our reliance on NEPA in finding jurisdiction is not inconsistent with the Supreme Court's admonition in its SCRAP opinion that "NEPA was not intended to repeal by implication any other statute."[21] The Court did not suggest that NEPA was to be ignored by the courts in considering threshold jurisdictional issues.[22]

The Court in *SCRAP* held only that NEPA did not revive judicial power that had been previously explicitly eliminated by Congress. 412 U.S. at 692–695, 93 S.Ct. 2405. This time we do not wield NEPA in the face of any statutory limitations on our jurisdiction; there is nothing in the Interstate Commerce Act which precludes our jurisdiction to review Section 15(7) orders, whatever the

limits it imposes on our injunctive power over carriers. We, like the previous courts which, in a non-NEPA context, declined to review general rate orders, are applying broad jurisdictional provisions, 28 U.S.C. §§ 1336, 2321, giving us power to review "any order" of the ICC. These provisions demand supplementation by other statutes and by judicially developed doctrines which limit court review of agency action. As stated above, previous courts found two of these doctrines to preclude court review of general rate orders. We find that the existence of NEPA requires us to reconsider the application of these doctrines and in NEPA cases to accept more of the broad jurisdictional authority granted us.

### III

We thus turn to an examination of the Commission's fulfillment of the NEPA mandate. We do not feel it necessary to rehearse at the outset the full structure and the particularized requirements of NEPA. Previous courts have done so adequately.[23] We do, however, think it important to emphasize before commencing our analysis that the courts have required strict compliance with the procedural commands of NEPA. Section 102(2)(C) of the Act, 42 U.S.C. § 4332(2)(C), prescribes in some detail not only what considerations must be addressed in an environmental impact statement, but also how the statement is to be developed and utilized. The Act states that "all agencies of the Federal Government" are to comply with these prescriptions "to the fullest extent possible." 42 U.S.C. § 4332. Far from providing "an escape hatch for footdragging agencies," this language "sets a high standard for the agencies, a stand-

---

21. *Id.* at 694, 93 S.Ct. at 2419.

22. The Court's *implicit approval* of the assertion of jurisdiction in Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971), suggests much the reverse. 412 U.S. at 695–696, 93 S.Ct. 2405. The *Seaborg* court reviewed whether a decision to conduct a nuclear test was made in compliance with

NEPA though, as we noted in our first *SCRAP* opinion, 346 F.Supp. at 197, absent NEPA no court would have authority to review such a decision.

23. *See, e. g.*, Environmental Defense Fund, Inc. v. Corps of Engineers, United States Army, 8 Cir., 470 F.2d 289 (1972) ; Calvert Cliffs' Coordinating Committee v. USAEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

ard which must be rigorously enforced by the reviewing courts." Calvert Cliffs' Coordinating Committee v. USAEC, 146 U.S.App.D.C. 33, 38, 449 F.2d 1109, 1114 (1971). Because of the extent of plaintiffs' attack on the impact statement, we further note that the courts' substantive review of agency action pursuant to NEPA is much more limited. Once a court is satisfied that the agency has "fully and in good faith" met all of NEPA's procedural requirements, it should not reverse an agency decision on the merits unless it can determine that the decision was "arbitrary or clearly gave insufficient weight to environmental values." *Id.*, 146 U.S.App. D.C. at 39, 449 F.2d at 1115.[24] Any substantive review would be predicated on Section 101 of the Act, 42 U.S.C. § 4331, which propounds certain substantive environmental goals which it is the "continuing responsibility of the Federal Government to use all practicable means" to achieve. One of these goals is to "enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources." However, because we view the Commission's efforts to comply with NEPA's procedural commands to be sorely deficient, we do not reach the question whether the Commission clearly gave insufficient weight to this environmental value.

■■ The purpose of all the requirements imposed by Section 102(2)(C) is to ensure that federal agencies integrate consideration of the potential environmental impacts of their contemplated actions with the policy considerations traditionally attending such actions. It is for this reason that Section 102(2)(C) specifically commands that an environmental impact statement and the comments of other concerned agencies on this statement "shall accompany the proposal through the existing agency review processes." The Commission's mode of preparation and utilization of

the challenged impact statement here violated both Section 102(2)(C)'s fundamental purpose and this specific command. The Commission's October 4 order explaining why the national transportation policy warranted the general rate increase was made without the benefit of an impact statement. It was only after its October order was greeted with an avalanche of criticism from environmental groups, EPA and CEQ that the Commission decided to prepare an environmental statement on the impact of the rate increases for recyclable commodities. The Commission did not, however, decide to start over again to reconsider fully the question of rate increases on recyclables. It instead merely reopened Ex Parte No. 281 "for the limited purpose of further evaluating * * * the environmental effects of increased railroad freight rates and charges" on the movement of recyclable commodities. ICC order of November 7, 1972. The Commission thus indicated that it had already made its decision and all that remained was to determine if the environmental effects of that decision could be justified. The Commission's May 2, 1973 order discontinuing Ex Parte No. 281 is further evidence that the Commission neither intended to give nor actually gave full reconsideration to the question of the recyclable rate increase. That one-sentence order merely adopts the entire staff-prepared impact statement. It makes no attempt to integrate the considerations of national transportation policy justifying the rate increase with the environmental considerations analyzed in the impact statement. Nor does it confront or even acknowledge the critical comments of other concerned agencies and environmental groups appended to the statement. This utilization of an impact statement simply does not comport with Section 102(2)(C). Only if the statement is prepared before an agency decision is made can it serve its purpose of

---

24. *Accord,* Conservation Council of North Carolina v. Froehlke, 4 Cir., 473 F.2d 664, 665 (1973) ; Environmental Defense Fund,

Inc. v. Froehlke, 8 Cir., 473 F.2d 346, 353 (1972).

informing the decision-making process at every stage. "Compliance to the *'fullest'* possible extent would seem to demand that environmental issues be considered at every important stage in the decision making process * * *." Calvert Cliffs' Coordinating Committee v. USAEC, *supra,* 146 U.S.App.D.C. at 42, 449 F.2d at 1118 (emphasis in original).[25] If the agency fails to prepare an impact statement before making a decision significantly affecting the environment, it must start its procedures over again, including the procedure required by Section 102 of NEPA, so that the decision-making process can be fully informed throughout.

In this case, not only did the Commission fail to start over in considering whether to approve the rate increases, it did not even take its after-the-fact environmental consideration through the entire "existing agency review processes." The "processes" for Commission review of proposed general rate increases are set forth in Section 15(7) of the Interstate Commerce Act. The Commission is empowered by the section to make orders concerning these proposed rates "after full hearing." The Commission held a hearing before its October 4 order before it had even commenced preparing an impact statement. It refused, however, to hold another hearing to reconsider the increase on recyclables it had already decided upon in light of the impact statement it had prepared. It should be clear to all agencies by now that hearings are key aspects of agency review processes during which environmental impact statements must be considered. The words of the Court of Appeals for the Second Circuit are clear:

"* * * [W]e conclude that the Commission was in violation of NEPA by conducting hearings prior to the preparation *by its staff* of its own impact statement * * *. * * *

"* * * [T]he statement may well go to waste unless it is subject to the full scrutiny of the hearing process * * *."

Greene County Planning Board v. FPC, 2 Cir., 455 F.2d 412, 422 (1972) (emphasis in original). And the words of the Court of Appeals for the District of Columbia Circuit are equally clear:

"The question here is whether the Commission is correct in thinking that its NEPA responsibilities may be 'carried out in toto outside the hearing process'—whether it is enough that environmental data and evaluations merely 'accompany' an application through the review process, but re-

---

**25.** *See also* Environmental Defense Fund, Inc. v. Armstrong, N.D.Cal., 352 F.Supp. 50, 55 (1972) (an impact statement "is not to be merely an exercise in project justification but rather a working paper of sorts, one essential input into agency decisions concerning the contours of Federal action").

In his dissent to the Court's reversal of our first *SCRAP* opinion, Mr. Justice Douglas quotes Congressman Dingell, a main sponsor of NEPA. That quotation unfortunately is even more appropriate at this stage of the *SCRAP* litigation.

"* * * Some agencies are complying poorly. They decide what they are going to do and then write an environmental impact statement to support the decision. That is not what Congress had in mind. I am fearful that we are breeding a race of impact statement writers who put all the right words down but don't really get environmental concerns involved in the decision-making process. * * *"

United States v. SCRAP, *supra* note 3, 412 U.S. at 713 n. 10, 93 S.Ct. at 2429. CEQ must have been aware of this problem in drafting its advisory guidelines on agency compliance with NEPA. These guidelines state:

"* * * It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council as early as possible in the agency review process in order to permit agency decisionmakers and outside reviewers to give meaningful consideration to the environmental issues involved. In particular, agencies should keep in mind that such statements are to serve as the means of assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made. * * *"

38 Fed.Reg. 10858 (1973).

ceive no consideration whatever from the hearing board."

Calvert Cliffs' Coordinating Committee v. USAEC, *supra*, 146 U.S.App.D.C. at 41, 449 F.2d at 1117. The railroads attempt to distinguish *Greene County* and *Calvert Cliffs'* by stressing that in those cases the agency hearings produced an examiner or hearing board report as an initial stage in the decision-making process, while in a general revenue proceeding the first and only decision is that of the Commission itself. But there is nothing in either of the cases, or more importantly in Section 102(2)(C), to indicate that, because a stage in the review process during which the proposed action is considered does not culminate in an intermediate agency opinion, that stage may be circumvented for purposes of NEPA. Indeed where, as here, the hearing is before the Commission itself, and is the only one provided, it may well be the most important stage in the decision-making process.

The Commission attempts to defend its refusal to hold hearings during which the impact statement could have been considered by arguing that those with environmental concerns had adequate opportunity to comment on the approval of the rate increase. The Commission primarily refers to the oral hearing held prior to the October order during which environmental comments were in order and to the Commission's solicitation of comments on the draft environmental statement. Neither can substitute for strict compliance with the commands of Section 102(2)(C). During the oral hearing held prior to the October order there was no impact statement, draft or otherwise, upon which environmentally concerned parties could focus their comments; nor was there any statement to inform the Commission as to the worth of any environmental

comments which were made. The comments on the draft statement, prepared subsequent to the October order, were directed to and considered by the agency staff members who prepared the statement. Section 15(7) hearings are to be held by the Commission itself and are a stage at which the Commissioners can be informed of environmental considerations. They thus constitute an independent and important stage in the agency review process.

### IV

If what we have discussed above was all that was wrong with the Commission's compliance with Section 102(2)(C)'s requirements, it might be sufficient for the Commission to hold another hearing in which all parties could participate fully in canvassing the NEPA and national transportation policy considerations concerned with rate increases. The Commission could then make a thorough reconsideration of the proposed recyclable rate increase in light of that hearing and the impact statement which it has already prepared. However, we find the statement itself to be deficient and to require repreparation. The statement seems to meet the prescriptions of NEPA as to form; it has sections, for instance, on the five considerations which NEPA requires agencies to address in their statements. However, as we stated above, a reviewing court must demand more than *pro forma* compliance with Section 102(2)(C); it must be assured that the agency engaged in a full and good faith "individualized consideration and balancing of environmental factors." Calvert Cliffs' Coordinating Committee v. USAEC, *supra*, 146 U.S.App.D.C. at 39, 449 F.2d at 1115.[26] We perused the statement carefully and cannot find that it presents such a full and good faith

26. "Compliance with NEPA is not established merely by the filing of an impact statement in the form and by the procedure outlined by the statute." Brooks v. Volpe, W.D.Wash., 350 F.Supp. 269, 275 (1972). *See also* City of New York v. United States,

E.D.N.Y., 344 F.Supp. 929, 940 (1972); Environmental Defense Fund, Inc. v. Corps of Engineers, United States Army, E.D.Ark., 342 F.Supp. 1211, 1214 (1972); cases cited at note 23 *supra* (all requiring "good faith" compliance).

consideration and balancing. This conclusion is not surprising given the above-recounted history of the statement's post-decision preparation.

We note first that a reader of the statement must be struck by the combative, defensive and advocatory language and style in which it is written. The statement continually attacks the views of those opposing the increase, denominating these "one-dimensional"[27] and impaired by "syndromes."[28] One report is slighted merely because it was prepared by urban groups[29] and EPA is chided for needing a course in the fundamentals of rate regulation.[30] Nowhere does the statement set forth an environmental argument against the rate increase as its own or as worthy of even partial acceptance; environmental arguments are ascribed to others and then rebutted.[31] The statement's defensiveness, and the Commission's insensitivity to its NEPA responsibilities, are even manifested at one point by an assertion that NEPA does not require any balancing of environmental costs: "[W]e find in [NEPA] no Congressional expression that we should invalidate railroad rate proposals otherwise shown by the proponents to be just and reasonable under the Interstate Commerce Act."[32] To be sure, a court probably would not declare a statement to give less than full and good faith consideration on the basis of its language and style alone. But we deem this language and style to be at least evidentiary of the fullness and the fairness of the agency's consideration.

More important to our judgment on the adequacy of the impact statement is its handling of the comments made on the draft statement. Section 102(2)(C) states:

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. \* \* \*"

42 U.S.C. § 4332(2)(C). The Commission circulated a draft statement not only to several concerned Executive agencies and departments, but also to the parties in this action. Most of the recipients of the statement responded with extensive critical comments. The Commission appended these comments to the back of its final statement and in some instances made arguments against the criticisms within the body of this final statement. None of these comments, however, caused the Commission to alter even partially its conclusions or to change the statement's analysis in any noticeable way. We find the Commission's failure to alter its draft impact statement in response to three of the critical comments of other federal agencies particularly troublesome.

First, it was suggested by the Department of Commerce and EPA that a quantitative and thorough economic study be made on the responsiveness of the demand for secondary materials to changes in transportation costs. The final statement criticizes the methodology of a privately commissioned study which concludes that the development of scrap iron markets is being retarded by the transportation rate structure.[33] But the

27. Environmental Impact Statement, *supra* note 11, at 11–12.

28. *Id.* at 14.

29. *Id.* at 10.

30. *Id.* at 194.

31. To this extent at least, the statement is not in accord with CEQ's advisory guidelines that a statement is not to "be used as a promotional document in favor of the proposal, at the expense of a thorough and rigorous analysis of environmental risks."

CEQ Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements, 3 Env.Rep.—Cur.Dev. 82, 84 (May 19, 1972).

32. Environmental Impact Statement, *supra* note 11, at 185.

33. Battelle Columbus Laboratories, Summary Report on the Impact of Railroad Freight Rates on the Recycling of Ferrous Scrap 2 (Jan. 14, 1972) (hereinafter "Summary Report").

statement does not offer any rigorous price sensitivity studies of its own.[34] Instead it relies on general discussions of past scrap demand trends. For instance, it bases its conclusion that the challenged increases will have no significant impact on demand for iron scrap primarily on the concurrence of past scrap demand and rate increases.[35] We find the statement's reliance on this concurrence troublesome because it ignores the fact that the demand for primary goods was also increasing during the period of past rate increases and the possibility that scrap demand would have increased even more if rates on iron scrap had been held down. It is difficult for us to understand how the statement can conclude that there is no significant environmental impact without a quantitative study of the responsiveness of the demand for each type of scrap to changes in recyclable transportation costs.

Second, EPA, which placed the statement in its "inadequate" category, suggested that a Department of Transportation Burden Study establishes that at least some secondary materials are contributing more revenue over costs than do the virgin materials with which they compete.[36] The statement, however, does not provide any comprehensive alternative analysis of the relative cost contribution of secondary and primary materials; it shows only that one type of scrap is not disadvantaged within one area relative to its competing virgin material.[37] The statement also speculates as to why the rate disparities might be cost-justi-

fied and stresses that railroad pricing is not in any case totally cost-based; it does not, however, present a rigorous analysis of what justifies the specific disparities between primary and secondary rates. We think that if the transportation costs do affect the demand for recyclable commodities, the impact statement must establish the particular justifications for the rate disparities.

Third, both EPA and CEQ criticized the draft statement for failing to consider the impact of the rate increase on long-term investment in facilities which can make fuller productive use of recyclables. The final statement was not modified in response to this criticism. Though in explaining why transportation rates have little impact on scrap demand the statement repeatedly makes reference to the technological and capital constraints on the use of scrap, the statement does not make any economic analysis of whether a hold down on recyclable rate increases might encourage the investment necessary to overcome these constraints. The statement does not, for instance, respond to one study's conclusion that the rate differential between iron ore and scrap iron plays a "crucial and negative" role in the decision of steel manufacturers to invest in facilities such as electric arc furnaces which can produce steel using all scrap and no virgin iron ore.[38]

The final statement's failure to address adequately the above three criticisms of the draft statement can be derived from what we view as its most

34. It is not, of course, sufficient under NEPA for an agency to dismiss the environmental impact studies of opponents of the proposed action. It is the agency's responsibility to engage itself in the study necessary to gauge environmental effects. "The requirement that the statement be detailed places a heavy burden on government agencies to gather for and include in the impact statement enough information to show that compliance has been genuine, not perfunctory. * * * NEPA requires each agency to undertake the research needed to adequately expose environmental harms." Brooks v. Volpe, *supra* note 26, 350 F.Supp. at 276, 279.

35. The statement asserts at one point that a price-sensitivity study is not required because of the concrete evidence of this concurrence. Environmental Impact Statement, *supra* note 11, at 72 n. 14a.

36. Dept. of Transportation, An Estimation of the Distribution of the Rail Revenue Contribution by Commodity Groups and Type of Rail Car—1969 (Jan. 1973).

37. Environmental Impact Statement, *supra* note 11, at 51.

38. Summary Report, *supra* note 33, at 24.

fundamental and important deficiency —the limitation of its analysis to the marginal impact of the most recent rate increase with no discussion of whether the underlying rate structure itself significantly affects the environment. The statement makes this limitation of its analysis explicit:

> "It is contended that our approval of increased rail rates and charges on commodities moving for recycling purposes will serve to aggravate discrimination already allegedly in the railroad freight rate structure, to the detriment of recyclable commodities and the national recycling effort. * * *
>
> " * * * [S]uch a case does not provide an appropriate vehicle for examining these issues. * * *"

Environmental Impact Statement at 22. We fail to understand how any consideration of the environmental impact of approving the recyclable rate increases could be full without an analysis of how the underlying rate structure itself affects the environment. It is the underlying rate structure which the percentage increases aggravate; if this structure contributes to the degradation of our environment, then the increases would at least presumptively aggravate that contribution. It is not enough to respond that whether a substantial rate disparity significantly affects the environment is not determinative of whether a marginal increase of that disparity itself has any significant impact. Any impact on the underlying structure could be eliminated by holding down recyclable rate increases each time the railroads requested a general rate increase.[39] The Commission's failure to hold down the

rate increases on recyclables would thus have a cumulative impact on the environment. Such cumulative impacts must be considered in NEPA statements. The Senate report on the passage of NEPA makes this clear:

> " * * * Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."

S.Rep.No.91–296, 91st Cong., 1st Sess., 5 (1969). The advisory guidelines for implementation of NEPA issued by CEQ are responsive to this congressional intent:

> " * * * The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated). * * * In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. * * *"

38 Fed.Reg. 10857 (1973).[40] We suspect that if the Commission had recognized that it was obligated to consider the environmental impact of the underlying rate structure it would have had much greater difficulty justifying even to it-

---

39. As stated by EPA in criticism of the final impact statement, "There is evidence that the current rate structure is inequitable in its treatment of some secondary materials and general rate increases tend to perpetuate these inequities." Letter from Acting Deputy EPA Administrator John Quaries to ICC Secretary Robert L. Oswald dated June 6, 1973.

40. Courts have thus made it clear that agencies may not seize upon the concept of "dis-

tinctive and comprehensive" stages of decision-making to escape impact statement preparation on the ground that early action such as laying the first section of roadbed of a new highway will entail little environmental impact in itself. *See, e. g.,* Citizens for Clean Air, Inc. v. Corps of Engineers, United States Army, S.D.N.Y., 349 F.Supp. 696, 708 (1972).

self the deficiencies in analysis upon which we focused above. For example, absent an elasticity study the statement would not have been able by citing past trends in scrap usage to dismiss the possibility that the underlying rate structure affected the amount of recyclables transported.[41]

The Commission argues that an ongoing comprehensive investigation into the railroads' freight rate structure, Ex Parte No. 270, justifies its failure to consider the environmental impact of the underlying rate structure. That investigation, having been delayed for several years, finally seems to be commencing,[42] though there apparently is some question whether this investigation will reconsider rate levels for recyclable commodities other than ferrous scrap.[43] However, regardless of how near to completion and comprehensive this study may be, it cannot substitute for the detailed impact statement which NEPA requires to be prepared *before* federal action significantly affecting the environment is taken, not in reconsideration of that action. The investigation in Ex

Parte No. 270 did not and could not inform the Commission's decision-making process with respect to the rate increase on recyclables.[44] If the Commission desires to utilize analyses developed in the Ex Parte No. 270 investigation in preparing an adequate impact statement, it should, as suggested by CEQ and Commissioner Brown,[45] place a moratorium on rate increases on recyclable commodities until Ex Parte No. 270 is completed.

The necessity for the Commission to consider the environmental impact of the underlying rate structure before approving rate increases on recyclable commodities is further underscored by the recent enactment of Public Law 93–236, 93rd Congress, the Regional Rail Reorganization Act of 1973. Section 603 of this Act requires the Commission to "adopt appropriate rules" to "eliminate discrimination against the shipment of recyclable materials in rate structures * * * where such discrimination exists." This provision is a legislative recognition of discrimination against recyclables in the existing railroad rate structure and a legislative direction to

---

41. The Commission argues that if we agree with the statement's conclusion that the recyclable rate increases will not have a significant impact on the environment, no impact statement was required in the first place and we can uphold the Commission's orders regardless of any findings we might make of failures to comply with the prescription of § 102(2)(C). We find this line of reasoning questionable. An acceptance of the Commission's argument would encourage agencies to avoid any explicit environmental balancing by concluding in impact statements that proposed actions have no significant environmental effects. However, because the statement's limited definition of the environmental impact it considers prevents us from accepting its conclusion of no significant impact, we do not need to reach this argument.

42. *See* 38 Fed.Reg. 28596 (1973).

43. *See id.* at 28600.

44. The Commission has effectively admitted both in the impact statement and in a later order that it needs to be more fully informed on the environmental impact of the underlying rate structure. The final impact statement asserts that neither the costs nor the benefits of utilizing the freight rate

structure "as a mechanism to allocate the costs of a recycling program * * * have been established." Environmental Impact Statement, *supra* note 11, at 192. In its notice on the recommencement of Ex Parte No. 270, the Commission stated through Commissioner Hardin:

"*It further appearing*, that while the 1969 burden study discloses that iron and steel scrap is one of the top twenty positive revenue contributors for movements within official territory, iron ores are similar [*sic*] disclosed for movements within official territory to be one of the top twenty deficit contributors to railroad net revenues;

\* \* \* \* \*

"*And it further appearing*, that there are presently available insufficient facts and data to enable the Coordinator properly to assess and quantify the environmental consequences of the numerous alternatives that may be pursued in the investigation program envisioned in this proceeding as required by the NEPA * * *."
38 Fed.Reg. 28600 (1973) (italics in original).

45. Environmental Impact Statement, *supra* note 11, at 213.

the Commission to eliminate it. The responsibility imposed by NEPA upon the Commission to "approach the maximum attainable recycling of depletable resources," 42 U.S.C. § 4331(b)(6), surely cannot be fulfilled unless this provision is complied with before rate increases on recyclable commodities are approved.

V

█ We thus conclude that not only the Commission's preparation and utilization of its impact statement but also the contents of that statement fail to comport with the obligations imposed on the Commission by Section 102(2)(C). We vacate the Commission's October 4, 1972 and May 2, 1973 orders and direct the Commission to reopen the Ex Parte No. 281 proceedings for full consideration of the proposed rate increases on recyclable commodities.

The Commission should first prepare another draft statement to be circulated as specified by Section 102(2)(C). This new statement must include an analysis of the underlying rate structure's impact on the movement of recyclable commodities. The analysis would presumably entail a determination of the elasticity of demand with respect to the price for each of several categories of recyclable commodities. The statement should also include an analysis of the effects of the rate structure on investment in manufacturing facilities which can make intensive use of scrap. Whatever impact of the rate structure on the short- and long-term demand for scrap is found should be translated into terms which meaningfully relate the environmental effects of the rates and rate increases. These effects are not necessarily limited to conservation of natural resources and elimination of solid wastes. For example, a recent EPA report states that 74 per cent less energy and 51 per cent less

water are expended and 86 per cent less air pollution and 97 per cent less mining wastes are engendered when scrap iron is used in lieu of virgin ore in the production of steel.[46] All the environmental effects must be balanced against the costs, if any, to the national transportation policy of attempting to alleviate the effects by not increasing the rates.[47] Though we are aware that railroad rates are not totally cost-based, an analysis of the costs of not raising the rates would presumably include a consideration of whether the scrap shippers are now bearing more than their "fair share" of the railroads' freight expenses. A comprehensive study of the contribution to costs made by each category of recyclable commodities and the primary goods with which they compete will thus probably be necessary.

█ After comments are received on the draft statement, a final statement should be prepared. This detailed statement shall then "accompany the [consideration of the proposed rate increase] through the existing agency review processes." As we have stressed above, in this case that review process includes a hearing before the Commission. Plaintiffs have argued that this hearing must be governed by Sections 556 and 557 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 556, 557 (1970), and that they thus must be given the opportunity to cross-examine those staff members responsible for preparation of the statement. We cannot agree. Rate-making, involving basically legislative-type judgments, is a form of rule-making which is governed by Section 553, rather than Sections 556 and 557, of the APA. *See* United States v. Florida East Coast R. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L. Ed.2d 223 (1973). Section 553(c) states: "When rules are required by statute to be made on the record after op-

---

46. U. S. Environmental Protection Agency, Report to Congress on Resource Recovery 8 (Feb. 22, 1973).

47. "In some instances environmental costs may outweigh economic and technical bene-

fits and in other instances they may not. But NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance." Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 23, 146 U.S.App.D.C. at 37, 449 F.2d at 1113.

portunity for an agency hearing, sections 556 and 557 of this title apply * *. *." 5 U.S.C. § 553(c) (1970). But the Supreme Court, in United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756–758, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), held that the words "after hearing" in another similar provision of the Interstate Commerce Act do not invoke Section 553(c) and thus Sections 556 and 557. "Sections 556 and 557 need be applied 'only where the agency statute, in addition to providing a hearing, prescribes explicitly that it be "on the record." ' " Id. at 757, 92 S.Ct. at 1950. See also United States v. Florida East Coast R. Co., supra, 410 U.S. at 234–238, 93 S.Ct. 810. We also find nothing in the existing regulations of the Commission requiring a full adjudicatory hearing. And inasmuch as NEPA requires only that the impact statement be transmitted through the existing agency review processes, we follow previous courts in refraining from holding that the Act requires an adjudicatory hearing where agency procedures do not provide for one.[48] We think, however, that "existing agency review processes" should be interpreted to encompass not only procedures required by explicit agency regulations but also those procedures which an agency customarily employs in consideration of a proposal of the type being analyzed for its environmental impact. In this case, when the general rate

increase was first being considered without an impact statement, oral hearings were held before the Commission. This fact at least establishes a strong presumption for us that full consideration of the revised impact statement through "existing agency review processes" must entail oral hearings before the Commission.[49]

After hearings are held, a final revised order should be issued manifesting a full reconsideration by the Commission of the rate increase on recyclables. This order should not be limited to adoption of the impact statement; it should include a reassessment of the national transportation policy supporting the original October order as well as a discussion of the final impact statement prepared by the Commission's staff and of the comments on the draft statement solicited from other concerned agencies.

## VI

This does not, however, end the case. Plaintiffs do not merely ask for a declaration that the Commission violated the prescriptions of NEPA and an order directing it to reopen Ex Parte No. 281 for reconsideration of the recyclable rate increases in accordance with these prescriptions. They also request that we enjoin the railroads from collecting the rate increments on recyclable materials until the Commission completes its full reconsideration. Such an in-

48. See, e. g., Jicarilla Apache Tribe of Indians v. Morton, 9 Cir., 471 F.2d 1275, 1285–1286 (1973); National Helium Corp. v. Morton, 10 Cir., 455 F.2d 650, 656–657 (1971); City of New York v. United States, supra note 26, 344 F.Supp. at 939–940.

49. We further think that a strong argument could be made that oral public hearings should be held based on the CEQ advisory guidelines which state:
"(e) Agency procedures developed pursuant to section 3(a) of these guidelines shall include provision for public hearings on actions with environmental impact whenever appropriate, and for providing the public with relevant information, including information on alternative courses of action. In deciding whether a public hearing is appropriate, an agency should

consider: (i) The magnitude of the proposal in terms of economic costs, the geographic area involved, and the uniqueness or size of commitment of the resources involved; (ii) the degree of interest in the proposal, as evidenced by requests from the public and from Federal, State and local authorities that a hearing be held; (iii) the complexity of the issue and the likelihood that information will be presented at the hearing which will be of assistance to the agency in fulfilling its responsibilities under the Act; (iv) the extent to which public involvement already has been achieved through other means, such as earlier public hearings, meetings with citizen representatives, and/or written comments on the proposed action. * * *"
38 Fed.Reg. 10858 (1973).

junction would be necessary to hold down the rates on recyclables; under the scheme established by the Interstate Commerce Act new tariffs filed by carriers are effective absent a Commission order finding the tariffs unreasonable. *See* 49 U.S.C. §§ 6(3), 15(1) (1970).[50]

As stated above, on June 7, 1973 we entered a temporary injunction against the railroads restraining them from collecting the rate increases pending our review of the Commission's October 4 and May 2 orders. The Supreme Court vacated this injunction and remanded the case to this court for reconsideration in light of its decision last term in Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade, *supra*. Though it is far from clear that that decision prevents us from granting plaintiffs further injunctive relief, it raises substantial enough doubts concerning the propriety of such relief to stay our hand.

We first note that our entering an injunction against the railroads is not precluded by the Court's reversal of our first injunction in this case——the injunction entered against the 2.5 per cent surcharge pending Commission consideration of the lawfulness of rate increases. In that reversal the Court held that Section 15(7) gave exclusive jurisdiction to the ICC to suspend rates pending its final decision on their lawfulness. United States v. SCRAP, *supra*, 412 U.S. at 690–691, 93 S.Ct. 2405. Now, however,

unlike the time at which we issued our injunction *against the* surcharge, the Commission has issued what it at least thought was its final order on the rate increases. And in *Wichita Board of Trade*, decided the same day as *SCRAP*, a majority of the Court stated that the terms of Section 15(7) do not govern a case in which the Commission has issued what it intends to be its final order. 412 U.S. at 820, 826–828, 93 S.Ct. 2367. Moreover, this *Wichita* majority affirmed that District Courts reviewing Commission orders must have at least some power ancillary to their general powers of review and protective of their jurisdiction to enjoin railroads from collecting new charges pending final determination of the suit. Mr. Justice Marshall, writing for four members of the majority, noted that while three-judge District Courts are only explicitly given power to enter orders against the Commission by 28 U.S.C. § 2324 (1970),[51] " 'judicial review would be an idle ceremony if the situation were irreparably changed [by private parties] before the correction could be made.' " 412 U.S. at 819, 93 S.Ct. at 2381, quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942). Here collection of the recyclable rate increases during the Commission's reconsideration may well cause further irreparable environmental degradation.[52]

However, Justice Marshall proceeded to state for the *Wichita* plurality that

50. The only consequence of our vacating the Commission's orders pending reconsideration of the rate increases "is that the railroads may not rely, in some subsequent proceeding, on a Commission finding that the proposed rates were just and reasonable. In an action for reparations, for example, the railroads could not gain any benefit from the purported Commission approval of the increases." Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade, *supra* note 16, 412 U.S. at 818, 93 S.Ct. at 2380.

51. The relief we grant today against the Commission is clearly not called into question by the Court's *SCRAP* or *Wichita* decisions. "Nor does anything in the Court's opinion today deny to the district courts power to enjoin the Commission to comply

with NEPA * * * so long as no injunction is issued barring implementation of the rates themselves, *cf.* Atchison, T. & S. F. R. Co. v. Wichita Bd. of Trade, *post*, p. 800 [93 S.Ct. 2367]." United States v. SCRAP, *supra* note 3, 412 U.S. at 724–725 n. 1, 93 S.Ct. at 2436 (opinion of Mr. Justice Marshall).

52. The railroads argue that this is an inappropriate case to exercise the ancillary power posited by Justice Marshall because the Commission can correct any violations of NEPA without the railroads being enjoined from collecting the increases. This argument reflects a total misunderstanding of NEPA's purposes. To be sure, the commands of NEPA will not change if the railroads collect the increases while the Com-

the considerations which underlay the Court's interpretation of Section 15(7) demand that the courts' ancillary power be limited. Justice Marshall's definition of the ancillary power is critical, for Mr. Justice Douglas, the fifth member of the *Wichita* majority, would detract not at all from the general power of this court to enjoin the railroads,[53] while three other members of the Court argued that District Courts lack any jurisdiction whatever to enjoin rates even after a final Commission order.[54] Justice Marshall stressed that the most important of the considerations underlying the Court's interpretation of Section 15(7) in Arrow Transportation Co. v. Southern R. Co., *supra,* the case primarily relied upon by the *SCRAP* Court, relate to the concept of agency "primary jurisdiction." This concept directs that until the agency has provided its own views a court should demur from expressing a view on matters which have been at least in part entrusted by Congress to an agency's discretion and concerning which the agency has developed some degree of expertise. Before a court issues an injunction pending final determination of a suit, it normally either implicitly or explicitly makes an estimation of the likelihood of ultimate success on the merits of the party challenging the agency action. *See* Virginia Petroleum Jobbers Assn v. FPC, 104 U.S.App.D.C. 106, 110, 259 F. 2d 921, 925 (1958). The expression of such an estimation may well pronounce the views of the court on matters such as national transportation policy which are within the agency's primary jurisdiction. A court contemplating an injunction pending final determination will further make some weighing of the magnitude and irreparability of the harms which would be suffered by the parties depending on whether an injunc-

tion is issued. *Ibid.* This weighing may also require the court to evince its beliefs on matters concerning which the agency being reviewed has primary expertise. The danger that a reviewing court issuing an injunction would thus intrude on the primary jurisdiction of the ICC moved the *Wichita* plurality to state that District Courts should not enjoin rates in order to protect their jurisdiction to review Commission orders unless they entertain "substantial doubt about the consistency of the Commission's action [on the substantive merits] with its mandate from Congress." 412 U.S. at 822, 93 S.Ct. at 2382.

Our uncertainty as to the meaning for this case of Justice Marshall's opinion has a dual origin. First, we question whether issuance of an injunction here would intrude upon the primary jurisdiction of the Commission. The injunction overturned by the *Wichita* Court was issued against the railroads' imposition of separate charges for inspection of grain in transit because the Commission's order approving such charges did not justify departure from a long-standing rule proscribing them. In issuing the injunction the District Court thus at least implicitly had to express its view that this departure was not justified. Matters of national transportation policy are, of course, within the especial expertise of the Commission; however, we are concerned here with matters of environmental policy and there is no reason to consider the Commission especially expert on the environment. Our issuance of an injunction pending final determination would need only be a statement of our belief that a full consideration of the rate increases' environmental impact will probably lead to a conclusion that those increases must be avoided. Further, Justice Marshall stressed that

mission attempts to comply with these commands. But the commands exist to enhance the quality of our environment, not to test agencies' capacity to respond to congressional directives. It is irreparable environmental change with which we must be concerned if our review is to be more than an "idle ceremony."

53. 412 U.S. at 826–828, 93 S.Ct. 2367.

54. 412 U.S. at 838, 93 S.Ct. 2367 (opinion of Mr. Justice White, in which Mr. Justice Brennan and Mr. Justice Rehnquist join, concurring in part and dissenting in part).

the injunction in the *Wichita* case was perforce based on a weighing of the injunction's harm to carriers against its benefit to shippers. Not only does this weighing of the interests of carriers and shippers exclusively involve considerations of national transportation policy; it also must be done against the background of Section 15(7) which, by providing for repayment of charges ultimately found to be unreasonable, makes reparable any harms which might accrue to shippers should an injunction not issue. Our issuance of an injunction here would require consideration of environmental degradation for which the Interstate Commerce Act does not and unhappily probably could not provide reparation. We thus question the applicability of Justice Marshall's *Wichita* analysis to this case. Our doubts are augmented appreciably by the fact that Justice Marshall dissented from the reversal of our first *SCRAP* opinion, advancing the same distinctions of our case from *Wichita* as we have set forth above. *See* 412 U.S. at 724, 728–732, 93 S.Ct. 2405.

But even if the analysis of the *Wichita* plurality is applicable to this case, we do not think it obvious that an injunction against the railroads would be inappropriate. Justice Marshall's *Wichita* opinion recognized that a court need not refrain from granting an injunction and thus stating its views on the merits if the court believes it would have to reverse the agency if it does not change its decision after reconsideration. We indeed do entertain "substantial doubt" about the consistency of the Commission's allowance of the rate increases with the congressional mandate that the Federal Government "use all practicable means" to "approach the maximum attainable recycling of depletable resources." 42 U.S.C. § 4331(b)(6). We indeed might well question whether the Commission can allow the recyclable rate increases without clearly giving "insufficient weight to environmental values." *See* Calvert Cliffs' Coordinating Committee v. USAEC, *supra*, 146 U.S.App. D.C. at 39, 449 F.2d at 1115. Nonetheless, out of an abundance of caution, we decline to consider further granting to plaintiffs additional injunctive relief.

The October 4, 1972 and May 2, 1973 orders are vacated and Ex Parte No. 281 is to be reopened for further proceedings consistent herewith.

So ordered.

FLANNERY, District Judge (dissenting):

The history of this protracted litigation is clearly set forth in the Court's majority opinion. That history reveals that the Supreme Court has on two occasions overruled findings of this Court on jurisdictional grounds.

I

*Jurisdiction*

On June 18, 1973, the Supreme Court held that this Court was without jurisdiction to issue a preliminary injunction restraining a temporary surcharge on shipping rates for recyclable commodities. The Court reasoned that section 15(7) of the Interstate Commerce Act [1] vested exclusive jurisdiction in the Interstate Commerce Commission to suspend rates, pending a final decision of their lawfulness. [2] On November 19, 1973, the Supreme Court vacated another injunction issued by this Court restraining the Commission and railroads from collecting certain rate increases on recyclable commodities, which the railroads intended to place in effect at the expiration of the statutory suspension period. [3] The case was remanded to this Court for further consideration in the light of Atchison, Topeka and Sante Fe Railway Co. v. Wichita Board of Trade. [4]

---

1. 49 U.S.C. § 15(7) (1970).

2. United States v. Students Challenging Reg. Agcy. Pro. (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

3. United States v. Students Challenging Reg. Agcy. Pro. (SCRAP), 414 U.S. 1035, 94 S.Ct. 533, 38 L.Ed.2d 326 (1973).

4. 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

These decisions by the Supreme Court clearly require this Court to reconsider its prior holdings and to determine whether it has jurisdiction in this matter.

In *Wichita*, the Supreme Court held that judicial review of Interstate Commerce Commission decisions in rate cases is limited in scope and that such decisions are not to be disturbed unless they are unsupported by evidence, are made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power. Since the Commission in the present case has not yet determined that the rates in question are reasonable, this Court is clearly without jurisdiction to suspend them. Arrow Transportation Co. v. Southern Railway Co.[5] The Supreme Court in *Wichita* also pointed out that Congress, in establishing the Interstate Commerce Commission, had created an administrative agency whose function was to develop an understanding of national transportation problems and to use that expertise to determine what our national transportation policy should permit. Consequently, a court should ordinarily refrain from expressing any view on such policy before the Interstate Commerce Commission expresses its view. For this Court to issue an injunction during an ongoing administrative proceeding would be to undercut the policies served by the doctrine of primary jurisdiction, and would slide the Court "unconsciously from the narrow confines of law into the more spacious domain of policy."[6]

It is the established rule that general revenue orders of the Interstate Commerce Commission, such as the suspension orders directed to individual rates in this case, are not reviewable by the courts.[7] The Supreme Court has ruled in this case that N.E.P.A. was not intended to repeal by implication any other statute.[8] There is no indication that Congress intended N.E.P.A. to overrule the long line of judicial decisions holding that general revenue orders, such as those presented in this case, are not reviewable by the courts.

This Court, therefore, clearly does not have jurisdiction to enjoin the collection of the increased rates on recyclable materials. It follows that since the Commission's orders are non-reviewable at this stage, this Court is without jurisdiction to grant the relief requested.

## II

### *N.E.P.A.*

Assuming *arguendo* that the Court has jurisdiction to review the adequacy of the N.E.P.A. statement submitted by the Interstate Commerce Commission, I find the statement to be sufficient and in substantial compliance with the requirements of N.E.P.A.

The mandates of N.E.P.A. pertain to procedure. Although N.E.P.A. itself creates no substantive rights in citizens to safe, healthful, productive, and culturally pleasing surroundings, the responsible federal agency is required to take these factors into account before commencement of a project. Upper Pecos Ass'n v. Stans.[9] The record in this case reveals that the Commission gave extensive consideration to the possible environmental impact of increased rates for

---

5. 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

6. Atchison, Topeka and Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. at 807, 93 S.Ct. at 2375; Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

7. Alabama Power Co. v. United States, 316 F.Supp. 337 (D.D.C.), aff'd by an equally divided court, 400 U.S. 73, 91 S.Ct. 259, 27 L. Ed.2d 212 (1970); Electronic Industries

Ass'n v. United States, 310 F.Supp. 1286 (D.D.C.1970), aff'd per curiam, 401 U.S. 967, 91 S.Ct. 1188, 28 L.Ed.2d 318 (1971); Atlantic City Elec. Co. v. United States, 306 F.Supp. 338 (S.D.N.Y.1969), aff'd by an equally divided court, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970).

8. United States v. Students Challenging Reg. Agcy. Pro. (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 2418–2419, 37 L.Ed.2d 254 (1973).

9. 452 F.2d 1233 (10th Cir. 1971).

certain recyclable commodities. The function of this court is not to decide whether it agrees with the Commission's substantive findings but only to decide whether the record reveals that the procedure set forth in N.E.P.A. was followed and whether the Commission has fully and in good faith considered all factors mandated by N.E.P.A. The Commission in my view has substantially complied with the requirements of N.E.P.A. Based on the substantial record already compiled, to remand for further hearings under N.E.P.A. would require the Commission to conduct a largely ritualistic act.

On November 7, 1973, the Commission reopened its investigation in this case for the purpose of further evaluating, in accordance with N.E.P.A., the environmental effects of increased railroad freight rates and charges on the movements of commodities being transported for the purpose of recycling. The Commission then spent several months preparing a draft statement which was issued on March 13, 1973. After soliciting and receiving the comments of interested persons and agencies the final Impact Statement was released on May 7, 1973. The comprehensive statement anticipates a potential adverse environmental effect stemming from the proposed rate increases but concludes that the increases are justified by the need to insure a viable and efficient railroad system. This Court has already recognized the financial plight of the nation's railroads.[10] The logic of the Commission's conclusion therefore seems unassailable. Moreover, it is buttressed by extensive findings which cover in detail the five categories set out in § 102(A)–(C) of N.E.P.A. The Commission has clearly taken the "hard look" at possible environmental consequences mandated by Congress. National Resources Defense Council v. Morton.[11]

Finally, the fact that the Commission's final impact statement was filed after the rates had been initially approved does not establish *per se* that the statement was biased and not issued in good faith. All that is required is that the agency make a reasonable good faith effort to comply with the procedural requirements of N.E.P.A. That the statement may have been prepared after the decision to proceed had already been made is not a fatal procedural error requiring the process to begin all over again. Jicarilla Apache Tribe v. Morton, 471 F.2d 1275, 1280 (9th Cir. 1973); Upper Pecos Ass'n v. Stans, 452 F.2d 1233, 1237 (10th Cir. 1971); City of New York v. United States, 344 F. Supp. 929 (E.D.N.Y.1972).

Even assuming technical non-compliance with N.E.P.A., if the Commission has considered all relevant environmental factors and has reached a fair and informed decision under N.E.P.A. its finding should not be set aside. First National Bank of Homestead v. Watson, 363 F.Supp. 466 (D.D.C.1973).

For the foregoing reasons, I respectfully dissent and would hold that the motions of the plaintiffs and intervening plaintiffs for summary judgment and for injunctive relief be denied, the case be dismissed, and judgment be rendered for the defendants with normal costs.

10. Students Challenging Reg. Agcy. Pro. (SCRAP) v. United States, 353 F.Supp. 317, 323–324 (D.D.C.1973).

11. 148 U.S.App.D.C. 5, 16, 458 F.2d 827, 838 (1972).